STATE OF MISSOURI, on the Information of J. E. TAYLOR, Attorney General, (Successor in Office to ROY MCKITTRICK), Relator, v. AMERICAN INSURANCE COMPANY, a Corporation, ET AL.—No. 36724. —200 S. W. (2d) 1.

Court en Banc, December 30, 1946.

Rehearing Denied, March 10, 1947.

1054

*J. E. Taylor,* Attorney General, *Robert L. Hyder* and *George W. Crowley,* Assistant Attorneys General, for respondent.

1056

*Fred L. Williams, David A. Murphy* and *Homer H. Berger* for respondents; *Williams & O'Bryen, Harding, Murphy & Tucker* and *Morrison, Nugent, Berger, Hecker & Buck* of counsel.

1058

1060

1062

██ WESTHUES and DALTON, CC.—Action in the nature of quo warranto to oust or otherwise punish the respondents, one hundred and twenty-two stock fire insurance companies conducting a fire, lightning and storm insurance business in this state, for alleged violation of the laws of the state, the misuse and abuse of franchises granted and the usurpation of rights, franchises and privileges not granted or conferred upon them by the state.

██ The action was instituted on May 29, 1939. A second amended information, upon which the cause was tried, was filed March 31, 1941. This information charged that the respondents had violated the Anti-Trust Statutes (Chapter 43, Art. 1, R. S. 1939, Mo. R. S. A. Secs. 8301-8317, inclusive) and the Insurance Rating Act (Chapter 37, Art. 8, R. S. 1939, Mo. R. S. A. Secs. 5971-5989, inclusive) by certain particular acts and conduct as therein set forth; that respondents had entered into a conspiracy to cheat and defraud their policyholders and the state and had bribed R. E. O'Malley, Superintendent of Insurance of Missouri, to compromise and settle pending litigation affecting insurance rates in Missouri, to recover certain impounded funds in that litigation and to approve a new schedule of insurance rates; and that respondents had employed a particular attorney at law to represent them, well knowing that said attorney was then employed by the Superintendent of Insurance of Missouri, and thereby aided, abetted and assisted the Superintendent of Insurance to violate the law and keep in his employ an attorney employed by the respondent insurance companies.

On September 5, 1939, this court appointed Hon. Samuel A. Dew, as special commissioner, to hear and report on certain pleas to the jurisdiction contained in respondents' separate answers. His findings and report were duly filed and the matter later heard and passed upon by this court en banc. At that time, certain insurance companies, other than these respondents, were discharged in accordance with the findings and conclusions of the special commissioner. State ex inf. McKittrick v. American Ins. Co., 346 Mo. 269, 140 S. W. (2d) 36.

Thereafter, on December 3, 1940, the court appointed Hon. John H. Windsor, as special commissioner, to take evidence on the issues joined on the merits of the cause and to report his findings of facts and conclusions of law. His report, finding respondents guilty as charged, was filed July 9, 1945. Respondents, acting separately,

have filed exceptions to the report and the cause has been argued and submitted on these exceptions.

The record in this cause contains in excess of 32,000 pages of testimony and exhibits, exclusive of the typewritten and printed briefs filed with the special commissioner and exclusive of the printed statements, briefs and arguments subsequently filed with this court. Briefly, respondents contend that there is no proof that they have violated either the Anti-Trust Statutes or the Rating Act. They insist that in good faith they have fully complied with the Rating Act; and that such compliance cannot be made the basis of this action on the theory that they have violated the Anti-Trust Statutes. Respondents further contend that, if an agent of any of the companies participated in the bribery of O'Malley, respondents had no actual or implied knowledge thereof, and the wrongful acts of the agent were unauthorized; that relator's cause on the issue of bribery is barred by the three year statute of limitations; and that the issue concerning the employment of an attorney employed by the Superintendent of Insurance is utterly without merit, both factually and as a matter of law.

██ That quo warranto is the proper remedy is, in effect, conceded [State ex inf. McKittrick v. American Colony Ins. Co., 336 Mo. 406, 80 S. W. (2d) 876; State ex inf. McKittrick v. American Ins. Co., 346 Mo. 269, 140 S. W. (2d) 36, 41 (6, 7)], but respondents point out that, since the proceeding partakes of the nature of a criminal prosecution, "it devolves upon relator to satisfy us of the guilt of respondents by clear and satisfactory evidence." State ex rel. Barrett v. Carondelet Planing Mill Co., 309 Mo. 353, 274 S. W. 780, 787 (8); State ex inf. Crow v. Continental Tobacco Co., 177 Mo. 1, 75 S. W. 737, 747.

### Prior Rate Litigation.

This quo warranto proceeding might be termed a climax to a legal battle, between the state and the stock fire insurance companies, over the question of rates to be charged for fire, lightning and windstorm insurance in this state. This controversy ██ was commenced in January, 1922, when the then Superintendent of Insurance, Ben C. Hyde, issued an order reducing the rates in Missouri 15 per cent. An injunction suit was filed by the insurance companies to prevent the enforcement of that order. The case was dismissed and the order withdrawn pursuant to a stipulation, which stipulation is set out in Aetna Ins. Co. v. Hyde, 34 Fed. (2d) 185, 1. c. 188, and State ex rel. Hyde v. Westhues, 316 Mo. 457, 290 S. W. 443, 1. c. 444. Thereafter, on October 9, 1922, an order was made by the superintendent reducing the rates 10 per cent. One hundred and sixty stock fire insurance companies jointly filed a statutory review proceeding in the Circuit Court of Cole County and the case was heard by John I. Williamson as referee. The insurance companies, after a long legal battle, lost that contest. The case was decided on the merits in June, 1926, by the

1064

Supreme Court of this state. See Aetna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65. Certiorari proceedings were dismissed in the Supreme Court of the United States. See 275 U. S. 440, 48 S. Ct. 174. The 10 per cent, which had been collected pending the litigation, was subsequently refunded to the policyholders. The Supreme Court of the United States did not pass upon the merits. The case was there dismissed because all the companies had joined in one suit and a federal question was not involved. The ultimate cost of insurance to the policyholders was what will hereinafter be termed the Hyde or the 90 per cent rate. The final chapter of that particular case was written April 14, 1930, when the Supreme Court of the United States in the case of Nat. Fire Ins. Co. of Hartford v. Thompson, 281 U. S. 331, 50 Sup. Ct. 288, affirmed a judgment of the Federal District Court at Kansas City in the case of Aetna Ins. Co. v. Hyde, 34 Fed. (2d) 185. Thereafter all of the cases pending in the federal court at that time, in which the 90 per cent rate was questioned, were dismissed and the Hyde reduction order became final. While the litigation over the 10 per cent reduction order was pending in the circuit court, the superintendent made an order reducing the rates 15 per cent below the 100 per cent rate. Other litigation followed. See State ex rel. Hyde v. Westhues, 316 Mo. 457, 290 S. W. 443.

About the time the controversy over the 10 per cent reduction order terminated the controversy over rates was approached from a different angle. On December 30, 1929, the Missouri Inspection Bureau, which is the agency in this state for each of the respondents in this case on the question of establishing rates, notified the Insurance Superintendent that a new schedule of rates would be filed, increasing the rates over the Hyde or 90 per cent rate by 16 2/3 per cent, which would place the rate at 105 per cent. The bureau acted for over two hundred companies. When the schedules were filed, which were to become effective as of June 1, 1930, the then Superintendent of Insurance, Joseph B. Thompson, refused to approve the increase. Thereupon, on May 28, 1930, one hundred and thirty-nine companies filed one hundred and thirty-seven separate suits in the federal court at Kansas City, Missouri, seeking to enjoin the superintendent from interfering with the collection of the increased rates, the contention being that the 90 per cent rate was confiscatory. The federal court issued a restraining order but ordered that the amount collected in excess of the 90 per cent rate be impounded and held in trust pending the litigation. That court appointed the Hon. Paul Barnett, master in chancery, to hear the cases and report his findings of facts and conclusions of law. The master filed his report with the court during the year 1933. The commissioner's findings were generally in favor of the insurance companies. United States v. Pendergast, 28 Fed. Supp. 601, l. c. 603, last paragraph.

In June, 1930, a suit was filed in the Circuit Court of Cole County in which seventy-four companies finally joined for a review of the order of the Superintendent of Insurance denying a 16 2/3 per cent increase in rates. That court also required the excess premiums collected to be impounded and held in trust pending the litigation. The referee, D. F. Calfee, appointed by the Cole County Circuit Court, heard the case and in December, 1934, filed his report finding ■ that the companies were entitled to a major portion of the increase.

The cases in the federal court were separate suits. In February, 1934, five of these cases had been submitted and briefed in the federal court consisting of three federal judges. The cases were taken under advisement. On April 29, 1935, the five cases which had been so submitted were by the court re-referred to the master for the purpose of determining whether the companies had refunded the excess collected pending the controversy over the Hyde reduction order. In May, 1935, while the cases were thus pending in the federal and state courts, the whole controversy was attempted to be settled and a stipulation and settlement were submitted to both the federal and the state courts. On June 22, 1935, a ''Motion For Decree'' was filed in the federal court in each of the cases therein pending. On February 1, 1936, a decree was entered, pursuant to the settlement and motion, dismissing each suit and providing for distribution of the funds, amounting to nearly ten million dollars.

The settlement agreement of May 18, 1935, between R. E. O'Malley, Superintendent of Insurance, and the companies, further provided for the reduction of all fire and windstorm rates from the 105 per cent level being collected, the re-establishment of the 100 per cent level, effective May 1, 1935, and further that the companies would file new rate schedules which would produce a rate level of not more than 97.6 per cent of the original printed rates. New rate schedules were accordingly prepared, filed and approved, effective November 11, 1935. The schedules actually filed by the companies and approved by the Superintendent of Insurance gave a rate level of 88.87 per cent. Further details of this settlement will be made later in this opinion. Later, when it appeared that the settlement had been obtained by bribery, a motion was filed in the federal court, by the then Superintendent of Insurance, Ray B. Lucas, setting forth the alleged bribery of O'Malley and asking the court to require each of the companies to show cause why the decree entered should not be set aside and the money collected by the insurance companies pursuant to the settlement be returned to the custodian and distributed to the policyholders. A decree was entered as prayed for by the Superintendent of Insurance. The details of this proceeding and the outcome will be found in American Ins. Co. v. Lucas, 38 Fed. Supp. 896, and also in an opinion on the motion for rehearing reported in

38 Fed. Supp. 926. See, also, United States v. Pendergast and O'Malley, 28 Fed. Sup. 601.

.The case in the state court came to a final conclusion when this court en banc decided that the compromise and settlement were void and that the Circuit Court of Cole County had no jurisdiction of the subject matter because all of the companies in the state court had joined in one suit to review the order of the superintendent denying the increase. This court held that to review such a question each company must bring a separate suit; and that ''Since no proper action was brought to review the order denying the proposed increase, there was no pending issue for the court to decide or for the parties to compromise and settle.'' See American Const. Fire Assur. Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795, l.c. 799 (2) et seq., l.c. 804 (18).

### Parts I and II.

### Alleged Violation of the Anti-Trust Statutes and the Insurance

### Rating Act.

After the alleged bribery was publicized the Attorney General instituted the present proceedings in quo warranto. We will first dispose of the charge that the respondent companies have violated the Rating Act and also the Anti-Trust Statutes of this state. To fully understand the situation it will be necessary to relate briefly a history leading up to the enactment of the Rating Act.

### Legislation Ante-dating the Rating Act.

In the year 1895 the legislature amended the Anti-Trust Statutes of this state so as to make them applicable to insurance companies. Laws 1895, p. 237. In 1899 another amendment was made, Laws 1899, p. 314, and again in 1907 the law was amended. See Laws 1907, p. 377. A number of insurance companies were prosecuted under these Anti-Trust Statutes. See State ex inf. Crow v. Firemen's Fund Ins. Co., 152 ■ Mo. 1, 52 S. W. 595, decided by this court in 1899. In the amendment of 1899 a provision exempting the larger cities of this state from the operation of the law was eliminated and thereafter the Anti-Trust Statutes were applicbale to insurance companies over the entire state.

In 1911 the legislature enacted what was called the ''Oliver Act''. See Laws 1911, page 267. This act required insurance companies to file a schedule of rates with the Superintendent of Insurance. It also permitted the companies to employ experts for the purpose of making a general basis schedule and rates. This law was repealed in 1913, Laws 1913, page 381. Also in 1913 a new section was added to the Anti-Trust Statutes providing in substance that if any insurance company, through its agents, consulted or used any rate book prepared by any other company, or bureau employed by any other

company, such act constituted prima facie evidence of a violation of the Anti-Trust Statutes. See Laws 1913, page 555, Sec. 10313a. That section is now section 8317. The enactment of that section and the repealing of the "Oliver Act" evidenced a complete reversal of the state policy as declared by the legislature. It caused confusion and turmoil in the insurance business. The extent of this conclusion can be learned by reading the case of State ex rel. Barker v. Assur. Co. of America et al., 251 Mo. 278, 158 S. W. 640. A large number of foreign insurance companies had agreed to discontinue doing business in this state. The Attorney General instituted quo warranto proceedings charging that such an agreement violated the Anti-Trust Statutes and asked the court to issue a restraining order. This court decided that any company had the right to discontinue doing business in this state, but that an agreement among the companies to do so was illegal. This state of affairs prompted the then Governor of Missouri, Hon. Elliott W. Major, to appoint a committee of seven, including the then Superintendent of Insurance, Hon. Charles G. Revelle, to make a thorough investigation of the question of insurance and to make recommendations to the next legislature. The committee performed the task assigned to it and pursuant to its recommendations a Rating Act, substantially as it is today, (See Laws 1915, page 313) was enacted. This Rating Act is now Art. 8, Chap. 37 R. S. 1939, Mo. R. S. A. All subsequent references to particular sections of the statutes are to the 1939 revision, unless otherwise expressly stated.

## Provisions of the Rating Act.

Section 5971 of the Rating Act requires every insurance company doing business in this state to maintain a public rating record from which rates to be charged may be ascertained. This section prescribes that such company shall keep in such record detailed information upon which the rates are based.

Section 5972 authorizes each company to maintain its own public rating record or to use a public rating record maintained by an Actuarial Bureau. This section prohibits any company from making an agreement with any other company to continue using the rating record of such bureau, to refrain from maintaining its own rating record, or to maintain rates as fixed by such bureau.

Section 5973 provides that any Actuarial Bureau, which consists of two or more members, shall be open for membership to all companies, authorized to do business in this state, applying therefor. This section also provides that the expense of maintaining the Rating Bureau shall be paid by the companies using it in proportion to the gross premiums received during the preceding year. It is most important to keep in mind that this section also provides that the companies

subscribing to the bureau "shall be responsible for the transactions and operations of such rating or actuarial bureaus."

Other sections of the Rating Act provide that all information and data gathered by such bureau shall be available to the Superintendent of Insurance for his use in determining whether the rates established are reasonable. The Rating Act places the insurance business of this state under the complete control and supervision of the State Insurance Department.

Pursuant to that law, and in particular sections 5971, 5972, 5973 and 5974, the Missouri Inspection Bureau (of which much will be said in the course of this opinion) was brought into existence. It is this bureau ██ that files with the Insurance Department the rates to be charged and forms of policies and endorsements on behalf of each of the respondent companies and many other companies. The Attorney General in his petition charged that the manner in which the respondents established rates violated both the Rating Act and the Anti-Trust Statutes. Respondents contend to the contrary. It will therefore be necessary to detail somewhat at length the method employed by the respondents in establishing rates.

### Establishing Rates.

#### The Missouri Inspection Bureau and Western Actuarial Bureau.

All of the respondents in this case and many other companies including mutuals and reciprocals, are subscribers to the Missouri Inspection Bureau. It is this bureau that acts as agent for each of the respondents for the purpose of maintaining a public rating record as is required by Sec. 5971, supra. It is not incorporated, and during all of the years while the litigation was pending it was managed by one Paul W. Terry. The cost of maintaining the bureau exceeds $330,000 per year. A cost which would be prohibitive for any one company. The bureau has in its employ engineers, expert inspectors, raters and clerical help for the purpose of making complete surveys and inspections of insurable property. Commercial and public buildings, factories and other large buildings are scientifically analyzed with reference to fire hazards. The bureau uses what is called the "Dean Analytic System", which is a patented or copyrighted scientific system whereby fire risks are measured and classified. An outline of a risk is divided into four main topics: Structure, occupancy, exposure and protection. Each of these is in turn divided into many sub-topics, the details of which need not be stated. Suffice to say the record shows insurable property may be classified by the use of this system so as to place any fire risk in its proper class for the purpose of determining a rate commensurate with the risk.

Inspectors employed by the bureau to make surveys and inspections must obtain a license from the Insurance Department. See Sec. 5976. This section also prescribes the duties imposed upon the

inspectors, one of these being to advise property owners as to changes and improvements which can be made to better the risk and obtain lower rates.

The record shows the existence of an Actuarial Bureau located at Chicago, Illinois, called the Western Actuarial Bureau. It is maintained by fifteen Rating Bureaus extending over eighteen midwestern states. The Missouri Inspection Bureau is a subscriber to the services of the Chicago Bureau. The Western Actuarial Bureau has in its employ a number of highly trained experts in the measurement of fire hazards. They are graduates of the Illinois Institute of Technology and also have had a number of years of practical experience in their line of work. This practical experience is necessary to qualify them for their task. Information is gathered from many sources. For example, if an unusual fire occurs a study is made as to its origin and cause, and also the inflammability of the material used in the construction. New products, such as plastics, used in the construction of buildings are examined to determine their susceptibility to fire and combustion. These and many other factors are considered in measuring a fire risk. The bureau may be termed a fact-finding body gathering information from many sources. With this information, the technical knowledge, experience and training of these experts, the bureau is in a position to give valuable advice to its subscribers, the state rating bureaus, on the question of schedule making. It may be said that this Chicago bureau was created and established by the fire insurance companies, including the respondents in this case, for the purpose of aiding the various state bureaus in determining proper rates to be charged for fire insurance. The cost of this bureau exceeds $135,000 per annum. The record justifies the assertion that the bureau saves the state bureaus the expense of gathering the information and it thus saves the companies many thousands of dollars. The bureau does not produce a profit. It is maintained wholly by the state bureaus which in turn are maintained by the fire insurance companies.

The Missouri Inspection Bureau, therefore, with the aid of the information gathered by its own employees and with the expert advice and recommendations of the Western Actuarial Bureau and certain other bureaus and committees hereinafter mentioned, arrives at what it determines to be proper rates, rules and forms to be put in force and effect in insuring the various risks in this state, and, after obtaining the approval of the Superintendent of Insurance, puts such rates, rules and forms into effect. The rates so approved, filed and put into effect are further subject to change by the superintendent under the authority of the Rating Act. For example, the record shows that on October 3, 1943, the then Superintendent of Insurance determined that the aggregate profits of the companies upon their Missouri business during the preceding five years was in excess of what

was reasonable to the extent of $600,000 per year. He, accordingly, ordered a reduction of at least that amount, in the aggregate per year, as to the rates charged by the companies on fire and windstorm insurance in this state and the reduction was made.

### The Missouri Audit Bureau and Its Function in the Matter of Collecting Rates.

The state in its brief condemns the Missouri Audit Bureau in no uncertain terms. The argument is prefixed with the following statement:

"The Missouri Audit Bureau was created solely to assist Respondents in maintaining an unlawful combination."

The record shows that the bureau came to life under the following circumstances. Sections 5979 and 5980 prohibit unfair discrimination between risks and forbids the companies to charge a rate different from that as indicated by its public rating record. The superintendent is given power to enforce these provisions. On September 14, 1917, the then Superintendent of Insurance, W. K. Chorn, sent a letter to Mr. J. B. Parker, Secretary of the Subscribers Actuarial Committee, in which letter the superintendent stated he had found that since the rating law went into effect each company was checking its own rates, resulting in many violations of the law. The suggestion was made that all policies should be inspected by a competent man and if it be found that an improper rate had been charged and the error not corrected within a reasonable time the matter should be referred to the Superintendent of Insurance. Pursuant to that letter the Missouri Audit Bureau was created by the insurance companies. This bureau is supported by assessments against the companies doing business in this state. All of the respondents are subscribers of the bureau. The manager of this bureau was employed by the Western Actuarial Bureau. The manager of the Missouri Audit Bureau looks to the Western Actuarial Bureau for advice on various problems, such as finance, auditing and management. The record discloses that the Superintendent of Insurance in December, 1936, addressed a letter to all mutual companies, doing business in this state, directing them, unless they had already done so, to make immediate arrangements to send daily reports to the bureau for auditing. The mutuals were further directed to authorize the bureau to permit the Insurance Department to examine all records filed with the bureau. A similar letter was directed to the reciprocal companies or exchanges. On August 21, 1937, Mr. J. F. Allebach, Deputy Superintendent of Insurance, instructed the bureau by letter to so keep the records as to be able at any time to furnish the Insurance Department up to date reports for each company whose business passed through the bureau.

All daily reports of the various insurance agencies in this state are sent to the Missouri Audit Bureau. The reports are checked to deter-

mine if the filed rate has been charged. The reports are then sent to the company office. If an improper rate has been charged the agency writing the policy is notified. A copy of this notice is attached to the daily report and sent to the company. It was shown that about 92 per cent of the errors are corrected after the first notice has been sent. The evidence on part of relator, as well as respondents, shows that the principal function of the Missouri Audit Bureau is to audit the daily reports, of the various insurance agencies, including mutuals and reciprocals, to determine whether the rates on file with the ■■ Insurance Department have been charged. In his brief relator quoted an excerpt from the testimony of a Mr. Buck, a member of the Subscribers Actuarial Committee, as evidencing the purpose of the Audit Bureau. The evidence is as follows:

"Well, it's my understanding that it is the purpose of the Audit Bureau, to see that the rates and forms filed in the state in which it is domiciled are clearly applied to every policy of insurance."

The function of this bureau and its purpose are admitted.

It is the contention of relator that respondents are using the Audit Bureau to maintain the rates fixed by the Missouri Inspection Bureau in violation of the last provision of Sec. 5972, which provides:

". . . that no company . . . may directly or indirectly by any agreement, contract, understanding or otherwise agree with any other company . . . to maintain the rates fixed by any such actuarial bureau."

The Actuarial Bureau referred to means a Rating Bureau as authorized by Secs. 5971 and 5973, in this case the Missouri Inspection Bureau. Section 5979 requires all insurance policies to be written at a rate as indicated by its public rating record. As we view the situation the State Insurance Superintendent has been and is using the Missouri Audit Bureau as an instrument for enforcing this statute, that is, Sec. 5979. As indicated above, the superintendent ordered all mutuals and reciprocals to make arrangements with the Audit Bureau to have the daily reports of such companies audited and to authorize the superintendent to inspect all of the records that may be filed by such companies with the Audit Bureau. The object accomplished by the activities of the Audit Bureau may be the forcing of all companies to charge the approved rates and use the forms and binders as approved and filed. But that is a compliance with the statute and not a violation. The record shows that the Audit Bureau uses the public rating record of the Missouri Inspection Bureau and the rating record as filed in the Insurance Department by the various companies as a check against the daily reports filed by the agents and thus the Audit Bureau determines if the approved rate has been charged and the proper forms used. The manager of the Audit Bureau testified that there are deviations, that is, some companies had filed schedules of rates and rules of practice with the Insurance De-

partment differing from those prepared by the Missouri Inspection Bureau; that it was therefore necessary to check the records of the Insurance Department as well as those of the Inspection Bureau. The rate, as approved by the Superintendent of Insurance, was always considered as controlling. It is therefore evident the Audit Bureau does audit all reports to see that the rates, as approved by the Superintendent of Insurance, are charged. The establishing of the Audit Bureau and its functions in the circumstances do not constitute any evidence that the Rating Act has been violated as charged. To illustrate the attitude of the Missouri Insurance Department toward the Audit Bureau as an instrumentality of enforcing the provisions of Secs. 5979 and 5980 we quote from a letter of the Superintendent of Insurance, dated December 14, 1936, addressed to all reciprocals or inter-insurance exchanges. The letter, after advising the companies as to certain corrections to be made, concludes with the following paragraphs:

"6. All daily reports covering on fire and lightning, tornado, windstorm and hail, and hail on growing crops insurance must be passed through, and audited by, the Missouri Audit Bureau, St. Louis, Missouri.

"7. You are hereby directed to immediately proceed with the necessary arrangements to file all required rates and rules with this Department either through an organized rate making agency or directly from your company, and also furnish evidence of your membership in the Missouri Audit Bureau, Pierce Building, St. Louis, Missouri.

"Your prompt compliance with the terms of this Order is expected."

This same rule, of course, applies to all stock fire insurance companies. All of the respondents send their daily reports to the Audit Bureau. In fact there does not seem to be much choice in the matter. Under the rulings of the Insurance Department all companies, whether stock fire insurance companies or mutuals, are required to have their daily reports of policies written audited by this bureau. We therefore hold that respondents violated no law in maintaining the Audit Bureau.

### Use of Same Rates As Prima Facie Evidence of A Violation of Anti-Trust Statutes.

 Relator insists that a prima facie case of violation of the Anti-Trust Statutes (particularly Secs. 8302 and 8304) has been made out against each of the respondents, because the evidence shows that the respondents, in writing policies of fire, lightning or storm insurance in this state, use the rate books, rule books and general basis schedules published by the Missouri Inspection Bureau, which bureau admittedly represents and acts for each of the respondents in main-

taining a public rating record. In this connection relator points to Sec. 8317, supra, of the Anti-Trust Statutes, which provides:

"In any proceeding against or prosecution of any insurance company under the provisions of this article, it shall be prima facie evidence that such company is a member of a pool, trust, agreement, confederation or understanding to control, effect or fix the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, if it be shown that such company or any agent or representative thereof, in writing insurance, has used any insurance rate, or made use of or consulted any rate book, paper or card containing any insurance rate, prepared, published, kept or furnished by any person, association of persons or bureau employed by, representing or acting in behalf of any other insurance company or association in and about the making and publishing of insurances rates for use in any portion of this state."

As heretofore stated, Sec. 5971 of the Rating Act requires the maintenance of a public rating record; Sec. 5972 provides that, "each company or other insurer shall be permitted to maintain its own public rating record or to use a public rating record maintained by an actuarial bureau . . ."; and Sec. 5973 provides that, "All rating and actuarial bureaus which consist of two or more members shall be open for membership to all authorized companies and insurers applying therefor . . ."; and that, "the members thereof shall be responsible for the transactions and operations of such rating or actuarial bureaus."

Relator says there is nothing in these sections of the Rating Act authorizing any one of the respondents to use "any insurance rate, . . . rate book, paper or card containing any insurance rate, prepared, published, kept or furnished by any person, association of persons or bureau employed by, representing or acting on behalf of any other insurance company . . ."

It is not the contention of respondents that Secs. 8302 and 8304 of the Anti-Trust Statutes have been repealed, but only "that if the stock fire insurance companies comply with the Rating Act such compliance cannot be made the basis of an action for violation of the Anti-Trust Law." Respondents say:

"We can see no good reason why the Anti-Trust Statutes and the Rating Act may not both stand, each operating in its own proper sphere and without conflict."

Respondents, however, insist that Sec. 8317, supra, has no application to them because they are acting under the express provisions of Secs. 5972 and 5973, supra, in maintaining the Missouri Inspection Bureau; and that these sections are in irreconcilable conflict in this respect with Sec. 8317, supra, of the prior act. They insist that the Rating Act (the later enactment) controls over the former. It is further respondents' contention that, if respondents have in good faith com-

plied with the Rating Act, such compliance cannot be made the basis of this action on the theory that respondents have violated the Anti-Trust Statutes. In this connection it should be noticed that no question has been raised by any party concerning the validity of the Rating Act or any section thereof. On the other hand, the relator relies upon the act, as valid, and bases this action, in part, upon alleged violations by respondents of the provisions of that act.

 In answer to the several arguments of the respondents, the relator states:

"The Missouri Rating Act constitutes the rules of law . . ., which must be followed by insurance companies in fixing rates and in the conduct of the insurance business. . . . The anti-trust law is a complement of the Rating Act. As long as insurance companies comply with the Rating Act, the anti-trust statutes constitute no obstacle or hindrance whatever to their business."

Regardless of these admissions, relator still contends that, under Sec. 8317, supra, a prima facie case of violation of the Anti-Trust Statutes has been made against all of the respondents for the reasons heretofore stated.

Relator relies upon the case of State ex rel. Barker v. Assur. Co. of America, 251 Mo. 278, 292, l.c. 295, 158 S.W. 640, where it was held that the provisions of the "Oliver Law", Laws 1911, pp. 267, 271 did not repeal the then Anti-Trust Laws of the state in so far as they referred to insurance companies. In that case it was pointed out that there was nothing in the record showing the respondents in that case, or any of them, had availed themselves of the particular clause of the "Oliver Law", there relied upon, by complying with its provisions, and that there was nothing in that act authorizing the respondents "to combine or conspire for the purpose of charging a fixed rate irrespective of the ruling of the Insurance Commissioner as to the reasonableness of that rate"; or "to conspire for the purpose of withdrawing from the State . . .".

Relator also relies upon the case of American Const. Fire Assur. Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795, l.c. 800, as authority for the position that a prima facie case of violation of the Anti-Trust Statutes has been made out because respondents all charge the rates filed by the Missouri Inspection Bureau. We find nothing in that opinion to support relator's position, but, on the other hand, the opinion apparently recognizes that companies may charge the same rates for reasons other than an unlawful agreement. The opinion states:

"It is true that companies in the same territory usually charge the same rate, but that condition is not brought about by the law, but by the fact that a company in a given territory could not get business if it charged a higher rate than other companies in the same territory. . . . 'As a practical matter of business, it is

impossible in the long run for some companies to collect higher premiums than those charged by others in the same terrtiory.'"

We think that relator's contention, in effect, amounts to a claim that a prima facie case of violation of the Anti-Trust Statutes has been made out against the respondents because they have done what was expressly provided that they could do under the Rating Act. This is particularly true, since Sec. 5979 of the Rating Act provides that:

"No company or other insurer or agents shall directly or indirectly, by any special rate, tariff, drawback, rebate, concession, device or subterfuge, charge, demand, collect or receive from any person, persons or corporation any compensation and premium different from the rate or premium properly applicable to the property so rated, as indicated by its public rating record, . . ."

In other words, all companies having membership in a rating or actuarial bureau can only charge the rates shown by their own rating record.

It is apparent that Secs. 5972 and 5973, supra, permit two or more companies to use a public rating record maintained by an actuarial bureau, which bureau is in turn supported by members, who are responsible for its transactions and operations, and since Sec. 5979 prohibits rebates or special rates and charges, other than as indicated by a company's public rating record, it is clear that the act does authorize more than one company to charge the same rate. It, therefore, appears that the Rating Act has expressly authorized exactly what Sec. 8317 prescribes as sufficient to make a prima facie violation of the Anti-Trust Statutes. In such situation Sec. 8317 of the prior act cannot control ▇▇▇ as to the specific acts authorized and permitted by the subsequent act. The provisions are necessarily repugnant and the later act controls. The rule is stated in State ex rel. City of Republic v. Smith, 345 Mo. 1158, 139 S.W. (2d) 929, 934 (14, 15), as follows:

"Moreover, where there are two acts on one subject, the rule is to give effect to both if possible, but if the two are repugnant in any of their provisions, the later act, without any repealing clause, operates to the extent of the repugnancy as to repeal the first. Meriwether v. Love, 167 Mo. 514, 67 S.W. 250."

See also, City of St. Louis v. Kellmann, 235 Mo. 687, 693, 139 S.W. 443, 444; State v. Taylor, 323 Mo. 15, 18 S.W. (2d) 474, 476; State ex rel. Reid v. Walbridge, 119 Mo. 383, 389, 24 S.W. 457. We hold that mere evidence of acts or conduct of the respondents expressly authorized or directed by the provisions of the Rating Act, and constituting a compliance with such Act, is wholly insufficient to make out a prima facie case of violation of the Anti-Trust Statutes or to sustain a charge in this proceeding that respondents have violated such Anti-Trust Statutes.

### The Missouri Inspection Bureau and Its Connection With Western Actuarial Bureau.

Relator, as further evidence of an unlawful combination on part of respondents to violate both the Rating Act and the Anti-Trust Statutes, points to the Missouri Inspection Bureau and its connection with the Western Actuarial Bureau. We have heretofore described both bureaus and their connection and have in this opinion decided that the Rating Act controls where its provisions are in conflict with the Anti-Trust Statutes. We also have in mind that the Rating Act contains provisions, against certain agreements among insurance companies, that may affect rates. Relator points out that both bureaus are owned, maintained and manned by the respondents, which he argues constitutes clear and convincing circumstances showing an unlawful combination and conspiracy. Here again relator relies upon State ex inf. McKittrick v. American Colony Ins. Co., 336 Mo. 406, 80 S. W. (2d) 876, and State ex rel. North British and Mercantile. Ins. Co. v. Thompson, 330 Mo. 1146, 52 S. W. (2d) 472. In both cases the point was, that the companies, parties to that suit, were held to be collecting the 16 2/3 per cent increase in violation of law because the proposed increase had not been approved, nor had any court made a lawful order authorizing the collection thereof. That point is not in this case. The Rating Act expressly authorizes the establishment of the Inspection Bureau and requires that it be maintained by assessments against its subscribers. Responsibility for its business is placed upon its subscribers. When the law places such authority and responsibility upon the companies and they assume such, it cannot be considered an unlawful combination. The gathering of information by the Inspection Bureau from various sources and the aid it receives in this respect from the Actuarial Bureau in ascertaining proper rates to be charged are authorized and legal. So long as the manner of doing business is as is authorized by the Rating Act it cannot be considered as evidence to support a charge of an unlawful combination. There must be something more shown to authorize a finding that the Rating Act has been violated.

This court in American Colony Ins. Co., supra, at page 890, syllabus 16, 80 S. W. (2d), used language which lends support to relator's contention. However, if we keep in mind the point of law there decided, it becomes apparent that the case is no authority for relator's position. The respondent companies in that case had joined in one suit to review the order of the Superintendent of Insurance in refusing to approve the increase in rates. The companies contended they could not be joined as respondents in a suit to prohibit them from collecting the increase pendente lite. This court held they could be so joined and that was the question of law that was being discussed. Since respondents had joined hands to review the order

of the Superintendent of Insurance they could naturally be joined in one suit to prohibit them from collecting the increase while that suit was pending. This court in that case did not hold that the companies had violated the Rating Act except in one respect, that is, collecting the proposed increase without authority of law.

Aggregate Experience Versus Individual Experience
As A Basis For Rate Making.

 Relator contends the Rating Act was violated by respondents in that the Missouri Inspection Bureau used the aggregate experience of all the companies as a basis for establishing rates to be filed with the Insurance Department, whereas the law requires each company to use its own experience as a basis for its rates. The cases of American Const. Fire Assur. Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795; Aetna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65, and State ex inf. McKittrick v. American Ins. Co., 346 Mo. 269, 140 S. W. (2d) 36, l. c. 40 (5), were cited as authority by relator. In the American Constitution case we do find language that when standing alone may be construed to give relator some support. However, when the opinion is read carefully it will be noted that the question there decided was simply this, that no company can question a rate, as approved by the Insurance Department, as being unreasonable or confiscatory if such company is earning a reasonable profit. In other words, anyone not hurt cannot question the reasonableness of the rate. The Supreme Court of the United States also so decided in Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 Sup. Ct. 174. The question of whether the aggregate or the individual experience was to be used as the basis for rate making was not before the court in the American Constitution case. If what is said in the opinion, 342 Mo. 139, 113 S. W. (2d) 795, l. c. 800 (8), is considered with the point of law there decided in mind, it becomes evident that the case is not authority for the contention that the rates must be based upon the individual experience of each company rather than the aggregate experience of all. The court there speaks of companies making a reasonable profit and holds that such companies are in no position to ask an increase in rates because other companies may be losing money; that the companies making a reasonable profit cannot join with those losing money in contesting a rate reduction order or in petitioning for a rate increase.

Our statute, Sec. 5984 of the Rating Act, contemplates that the Superintendent of Insurance, when determining whether the existing rates are reasonable, shall take the aggregate experience of all companies and not their individual experience. The statute in that section treats the companies collectively and not individually. The Supreme Court of the United States so decided in the Aetna case. See Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 Sup. Ct. 174, l. c. 176. The court there said:

". . . the Missouri statute before us narrowly limits the authority of the superintendent of insurance. He is not authorized to determine whether, when applied to the Missouri business of the several companies, or of any of them, the existing or prescribed rates had been or would be just and reasonable. Section 6283 requires consideration en masse of the 'result of the earnings' of all the companies, and, upon finding an excessive 'aggregate profit,' it becomes the duty of the superintendent to limit the 'aggregate collections' to not more than a reasonable profit. The reduced rates are applicable to the business of all companies alike, and without regard to the amount of the past or prospective profits or losses of any of them; and the attack is by joint action of all the companies. It is not claimed by or on behalf of any company that, when applied to its business, the reduced rates are or would be too low to permit the company to make a reasonable profit, or to have just compensation for its contracts of insurance.

"No company receiving just compensation is entitled to have higher rates merely because of the plight of its less fortunate competitors. Companies whose constitutional rights are not infringed may not better their position by urging the cause of others."

 This court in the same case, Aetna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65, l. c. 69, said:

"Insurance companies always have active competition among each other. The rating act was intended to remove the temptation to pool in violation of the anti-trust laws and to prevent ruinous competition. The statute contemplates that the rates shall be fixed with a view of the aggregate earnings and profits for the insurance business in the state. Each company may make as much money as it can. Some may make enormous profits, some may do a losing business, but the average profit, that is, the aggregate profit on the aggregate business, must be reasonable."

The question of the manner in which rates are to be determined was directly before this court in the case of Aetna Ins. Co. v. Hyde. The case is, therefore, in point. We hold that in establishing rates the Missouri Inspection Bureau and the Superintendent of Insurance have followed the correct method, as prescribed by our statute by using the aggregate experience of all companies and not the individual experience of each company as a basis. We need not speculate upon the chaotic condition that would result if rates were to be based on the experience of each individual company. That is self-evident.

### Joining in Litigation as Evidence of Unlawful Combination.

 Relator asserts that respondents maintained an unlawful combination and violated the Rating Act and the Anti-Trust Statutes to establish the 16 2/3 per cent rate increase by filing suits in the federal court. Relator in his brief says:

"The Respondents did, apparently for appearance's sake, file separate injunction suits restraining the State Officials from interfering with their unlawful increase of rates. But their motive was joint. They had the same attorneys; they followed the same practices and procedure. The Subscribers Actuarial Committee handled the litigation for all of them jointly."

Relator cites, to support the contention made, the case of State ex inf. McKittrick v. American Colony Ins. Co. et al., 336 Mo. 406, 80 S. W. (2d) 876, and says with reference to this case: "This exact point was before this court." The principal point in that case was whether the fire insurance companies, named as respondents in that case, violated the Rating Act by collecting the 16 2/3 per cent increase while the suits were pending to establish the increase and before it was approved by the Superintendent of Insurance. This court held that since respondents had filed a joint action and had not made a showing that the rates were confiscatory and had not applied for an injunction on the theory that the rate approved was confiscatory, or given an injunction bond, the collection of the 16 2/3 per cent increase was without authority of law. It was further held that the collection thereof was illegal even though the Superintendent of Insurance consented thereto and the court having jurisdiction of the case made an order impounding the funds. The court, however, pointed out very definitely the procedure to be followed so as to render the collection of the proposed increase in rates legal, pending the determination of suits to establish such increase. This subject is treated on pages 888, last paragraph of syllabi 10, 11; 888 (12, 13) and page 889, paragraph 3 of syllabi 14, 15. In substance it was held that if a suit be filed to contest the reasonableness of the superintendent's refusal to approve an increase, the increase could be legally collected if the company filing such suit made a prima facie showing that the approved rate was confiscatory and filed an injunction bond. Note the concluding paragraph of the opinion wherein the respondents were prohibited from collecting the 16 2/3 per cent increase, where the court said:

". . . unless and until the same be approved by the superintendent of insurance of the State of Missouri as provided by law, *or the same be permitted under the order, judgment, or decree of a court of competent jurisdiction in that behalf.*" (Italics Ours.)

None of the respondents in this case were respondents in that case. The respondents in this case each filed separate suits in the federal court and followed the precise procedure as outlined by this court. The collection of 16 2/3 per cent increase under the supervision of the federal court in those cases was therefore legal and such collection was not a violation of the Rating Act, nor can such action be considered as any evidence of an unlawful combination.

The law permits and authorizes, as pointed out elsewhere in this opinion, the establishment of the Missouri Inspection Bureau as an Actuarial Bureau. The law authorizes any insurance company to subscribe to the service of this bureau and to constitute it as the agency for the purpose of filing rates and rules with the Superintendent of Insurance for approval. All of the respondents subscribe to this bureau and therefore when this agency, from the information it has, deems an established and approved rate inadequate it is its duty to apply for an increase. Sec. 5987. When that is done it naturally follows that the bureau will ask for such an increase and file the proposed rate on behalf of each company it represents. That is what the agency did when, on December 30, 1929, it filed the schedule of rates to establish the 16 2/3 per cent increase. That action on part of the Inspection Bureau does not prove that respondents conspired and agreed to charge the same rates as relator contends.

When the superintendent refused to approve the rate filed, each company had a right to ask for a review of the order of refusal. See Sec. 5985. Note that this section provides that "the burden of proof as to the unreasonableness or injustice of any order made by the superintendent of insurance shall rest upon the party or company, or *companies* appealing from such order." (Italics Ours.) All of the respondents claimed that the established and approved rate was confiscatory. The Superintendent of Insurance contended otherwise. All of the companies had a common and similar interest in that question. To determine it the same evidence would to a great extent apply to each company. About the only deviation would be the individual profit and loss experience of the various companies. The superintendent in determining whether the rate was reasonable would take the aggregate experience of all. In such a situation we see nothing unlawful in permitting the agency, the Missouri Inspection Bureau, to employ attorneys to represent the various companies in such litigation. Neither do we see anything unlawful in that the Subscribers Actuarial Committee, hereinafter mentioned, approved the attorneys' fees and other expenses. Sec. 5973 expressly authorizes such supervision. Note what it says:

"The expense of maintaining such rating or actuarial bureaus shall be paid directly by the members in proportion to the gross premiums received by each member during the preceding year in the state and the members thereof shall be responsible for the transactions and operations of such rating or actuarial bureaus."

The only practical way for the companies to supervise and be responsible for the bureau was through a committee appointed for that purpose. The attorneys' fees were paid through the Inspection Bureau by assessment against the various companies as the statute provided.

As to respondents employing the same practice and procedure, suffice to say that under the rulings of the Supreme Court of the United States in the case of Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 Sup. Ct. 174, and the ruling of this court in the case of State ex inf. McKittrick v. American Colony Ins. Co., supra, the only practice and procedure authorized was the one respondents followed in the federal court, as all suits of identical nature require the same procedure. The fact that respondents in this case all followed the same procedure was no evidence of any unlawful combination in violation of the statute.

### Alleged Violation of the Anti-Trust Statutes and the Rating Act by Operation Through Other Associations.

Consideration of relator's other contentions that respondents have violated the Anti-Trust Statutes and the Rating Act requires a statement concerning certain associations, bureaus and committees which respondents and other stock fire insurance companies have organized and maintain to discharge particular functions. Only a few of these need to be considered, towit, the Western Underwriters Association, the Western Insurance Bureau, the Subscribers Actuarial Committee, the Uniform Forms Committee, the National Automobile Underwriters Association, and the Insurance Executives Association. The first four of these organizations are directly connected with the Missouri Inspection Bureau, or operate through it. Relator refers to the Western Underwriters Association as "the dominating force in the stock fire insurance trust in the midwest territory" and says, that it is a powerful combination fixing rules, forms of policies, rates to be charged for insurance and the amount of commissions to agents. The Western Insurance Bureau and the National Automobile Underwriters Association are placed in the same class, but as less powerful organizations. The latter, as its name implies, operates in a particular field. The Uniform Forms Committee is considered as a further instrumentality used by respondents in perpetuating a trust controlling the insurance business and fixing forms of coverage directly affecting rates. The Subscribers Actuarial Committee is referred to as "the most powerful organization in the fire insurance business in the midwest." The importance of the Insurance Executives Association will appear later. It will be necessary to examine the purpose and functions of these organizations in some detail.

### Western Underwriters Association.

The Western Underwriters Association is a voluntary association of insurance companies which operates in fifteen states (including Missouri). Its membership comprises approximately 250 stock fire insurance companies. Its purpose is to promote reforms in under-

writing, control of expenses and the ethical conduct of the business. When the membership is not in session it operates through a governing committee. Membership is personal, and active members are officers duly authorized to act and speak for their companies. The association undertakes to limit commissions (to agents and brokers) to be paid by its members' companies. It has a maximum scale or ceiling on commissions, above which the companies cannot go in allowing commissions, and members are disciplined and fined for paying commissions greater than the scale set. It does not deal with rates and such matters are transferred to the Subscribers Actuarial Committee or the Western Actuarial Bureau. The association supports uniform forms and purposes to have standard form policies, endorsements, mortgage and loss payable clauses. Six of its members are appointed as members of the Uniform Forms Committee. Six of its members are on the Subscribers Actuarial Committee.

The Governing Committee is given power to enforce all rules and practices, approve rates and commissions, and it may approve rules of practice, schedules and rates made by any association or committee satisfactory to it. It is given the exclusive and final jurisdiction over all complaints and charges of violation of the rules of the organization (subject to certain rights of appeal). It may deal with "unfriendly" conduct, such as disturbing other members agencies, and penalties may be imposed. It may investigate the records of any member where it may be pertinent in connection with any investigation. It may pass upon, approve or disapprove forms, and its decisions are binding on all members.

All daily reports, endorsements and cancellations of each member on fire, tornado or other business must be reported through the established and approved audit bureau.

The articles of agreement provide:

"Nothing in the rules or the legislation of the Association and nothing in this Agreement shall be held binding as to any territory where such rules, regulation or this agreement may conflict with law."

Accordingly, on the advice of its attorney, forms and commissions, but not rates and cooperation are mentioned in bulletins sent into Missouri. The association is supported by the companies by assessments on a pro rata basis of premiums received during the previous year.

Western Insurance Bureau.

, The Western Insurance Bureau is a non-profit corporation, without capital stock, organized for purposes similar to the Western Underwriters Association. Its members are individuals representing certain fire insurance companies, including eight respondents. Its business is conducted by a board of directors. It has a rule fixing a maximum scale of commissions that may be allowed agents of the companies represented. Its by-laws provide:

"In all states where not contrary to law, members of the Western Insurance Bureau shall be and are hereby required to collect the tariff rates in all territory as made by recognized Rating Organizations or Bureaus operating therein and approved by the Directors."

The bureau elects one of its members to membership on the Subscribers Actuarial Committee. The record contains evidence indicating an understanding that the Western Actuarial Bureau should not promulgate rules and forms prior to approval by the Western Insurance Bureau. The Subscribers Actuarial Committee submits to the bureau proposed changes in forms and the bureau reports to the committee the action of its board of directors on all insurance questions submitted to it by Subscribers Actuarial Committee.

### Subscribers Actuarial Committee.

The Subscribers Actuarial Committee was formed in 1915 for the purpose of advising ways and means of putting into effect the standardized term rule, that is the rule by which the premium for a three year term policy is fixed at $2\frac{1}{2}$ times the annual premium and for a five year term policy at four times the annual premium. The committee consists of eight members elected by the executives of the companies that are subscribers to the respective state rating bureaus. Six members of the committee are members of the Western Underwriters Association and one is a member of the Western Insurance Bureau. The committee has no office, no by-laws, no rules of operation and its authority is undefined. Its present secretary is also the manager of the Western Actuarial Bureau.

It is conceded that after about 1919 or 1920, the Subscribers Actuarial Committee became the representative of the members (subscribers) to whom the managers of the Bureaus could look for advice and recommendations as to the proper conduct of the bureaus and the solution of their administrative and financial problems. This committee is the only committee representing the common interests of all companies subscribing to the Missouri Inspection Bureau and other bureaus which are served by the Western Actuarial Bureau. The record indicates that the committee supervised the selection of the managers of the Western Actuarial Bureau, the Missouri Inspection Bureau and the Missouri Audit Bureau, and determined their salaries. It further supervised and approved the rate and amount of levies or assessments to support each of these bureaus. The companies, who are subscribers to the Missouri Inspection Bureau, through this committee, control the financial expenditures of the bureau including the amounts paid as attorney fees and money to be borrowed therefor. The committee, in dealing with rate and schedule matters that are presented to it by its secretary, acts under no specific authority. Because its members are in contact with the business of underwriting and insurance, its secretary (the manager

of Western Actuarial Bureau) seeks its help and guidance on many underwriting problems.

During the progress of the litigation on the 16 2/3 per cent rate increase the committee advised the companies from time to time relative to methods of making their impoundings and whatever other steps were taken in the litigation which necessitated action on the part of the companies. That was also true in the old restitution case in making the reports and paying judgments. The attorneys used the committee's bulletins as a means of disseminating that information. Any expense of Subscribers Actuarial Committee is paid by Western Actuarial Bureau. The committee, through its secretary, reports semi-annually to the subscribers giving them information of interest gathered from many sources.

It further appears that rating bureaus attempt no changes in forms of coverage without the approval of the Subscribers Actuarial Committee. The Committee originates rules of practice, which, after approval by the Western Insurance Bureau and the Western Underwriters Association, are sent to the inspection bureaus. The committee's recommendations of certain rates and rules are made subject to approval by the rating authority in the particular state. It is conceded that the manager of the Missouri Inspection Bureau consulted this committee before instituting the 16 2/3 per cent rate litigation, because the suits involved "a matter of expense and the matter of maintaining filed rates by the Bureau for the companies which were members."

### Uniform Forms Committee.

The Uniform Forms Committee is composed of company executives. The Western Underwriter's Association, the Western Insurance Bureau and non-organization companies are represented on the committee and subscribe to its service. The committee is supported by assessments on the companies. The committee prepares, adopts and promulgates standard forms for policies, endorsements, mortgage clauses and other forms. The purpose of having uniform forms is to avoid confusion and litigation arising out of the use of a multiplicity of forms, to permit all policies covering a particular risk to cover it in the same manner and to the same extent, and to let the public have the same protection from any company dealt with.

The secretary of the Uniform Forms Committee is also secretary of the Subscribers Actuarial Committee and manager of the Western Actuarial Bureau. All requests or recommendations for new forms or changes in forms are referred to this committee. Forms are constantly undergoing change. Forms approved by the Uniform Forms Committee are also submitted to the Subscribers Actuarial Committee, to the Western Insurance Bureau, and to the governing committee of the Western Underwriters Association for their approval before

such forms are forwarded to the inspection bureaus, such as the Missouri Inspection Bureau. Both Western Underwriters Association and the Western Insurance Bureau support the use of these uniform forms, but no form is used in Missouri until approved by the Superintendent of Insurance. The use of uniform forms has had the support and approval of the National Convention of Insurance Commissioners.

### National Automobile Underwriters Association.

The National Automobile Underwriters Association, a nation wide association, was formed in 1930. Its principal function is to secure uniform policy forms, establish rating methods and rates to be charged for insuring automobiles against loss by fire or other causes. These rates, as fixed by the association, are sent to the Inspection or Rating Bureaus in the various states, including the Missouri Inspection Bureau. The Missouri Bureau uses the rates as fixed by the national association as a basis for establishing rates in Missouri to be filed with the Insurance Department for its approval. The record shows that quite often an employee of the national association accompanies Mr. Terry of the Missouri Inspection Bureau to the Insurance Department for the purpose of discussing what rates are to be charged. The evidence discloses that as a general rule the Missouri Insurance Department does not accept the original figures. The rates, as established and collected in this state, are thus approved by the Superintendent of Insurance.

### Insurance Executives Association.

In 1932 a number of insurance companies formed the Insurance Executives Association with offices in New York City. At the time of the hearings before the referee all but fourteen of the respondents were affiliated with this association. In the briefs relator and respondents do not agree as to the purpose of this association. We, therefore, quote from the articles of the association the purposes for which it was created. The articles provide that:

"This organization shall be known as the Insurance Executives Association. Its principal objects shall be in every lawful way (a) to maintain among its members a spirit of loyalty to obligations, to establish ▮▮▮ the practice of fair dealing and the observance of ethical principles in competition with one another, and to support all territorial and special organizations which shall be listed by the board of trustees and of which companies represented in the organization are or shall become members, (b) to bring about improvements, reforms, and economies in the methods and practice of conducting the business of fire insurance and its allied lines so that the methods for making rates may be simpler and more economical; that rates may be better adapted to the needs of various localities, classes of business and individual owners; that forms of coverage better suited to

the changing conditions of business and manufacture may be devised; and in general that the operations of companies may be more efficiently conducted and better service rendered to the insuring public, and (c) to promote the interests of stock insurance companies.''

The articles further provide that membership in the association shall be personal and shall consist of executives of insurance companies of a range not lower than vice-president if an American company, or assistant manager if a foreign company. The association is maintained by assessments against the companies represented and it follows that the association is controlled by the membership paying for its continuing existence. The articles also provide as follows:

''This organization shall not assume or exercise jurisdiction relating to the making or maintenance of rates of insurance or over the control or commissions paid or allowable to agents, or the manner of transacting business in any state wherein the exercise of such jurisdiction or control is or may hereafter be unlawful.''

The association is given power to correct and suppress unfair or unethical conduct on part of any of its members and may assess a penalty for a violation of the principles as set forth in the articles of the association. The articles contain the following proviso:

''The Association may render decisions as to the duties imposed upon its members either by the laws of the several States or by the rules of organizations of which they or their companies are members.''

The articles provide for officers, including a president and a secretary. The first president of the association was Mr. Paul L. Haid. He was so serving at the time of the hearing before the referee. The secretary was Mr. J. B. Erskine, who had acted as secretary from the inception of the association. We mention these two officers by name because it will be necessary to refer to them later in this opinion on another question.

Relator refers to these various organizations in connection with arguments that ''Respondents themselves are fixing rates, rules and forms used in this state by agreement'' in violation of the Anti-Trust Statutes and the Rating Act. Relator, as evidence of alleged unlawful agreement, reviews the evidence concerning the several organizations, committees and bureaus mentioned, and emphasizes the fact that respondents do charge the same rates and use the same rules and forms. It is apparent that the respondents and other stock fire insurance companies, (connected with or operating through the Western Underwriters Association, the Western Insurance Bureau, the Subscribers Actuarial Committee, the National Automobile Underwriters Association and the Insurance Executives Association) fix insurance rates, rules and forms in this state *only* to the extent that these organizations or committees act through or in connection with the Missouri Inspection Bureau. It further appears that, except as to the 16 2/3 per cent increase, all rates, rules and forms have been filed

with and approved by the Superintendent of Insurance of Missouri. We have considered relator's arguments concerning the Missouri Inspection Bureau, the Western Actuarial Bureau and the Missouri Audit Bureau. We have further held that, under the express terms of the Rating Act, members of the same rating bureau may charge the same rates. In this connection we must further recognize that the respondents and other stock fire insurance companies have long contended that the reduction rates, as required by the Superintendent of Insurance, have been ▮▮▮ confiscatory and they have engaged in extensive litigation to obtain increases. Under such circumstances it would be expected that they would charge the maximum permissible rates, and the mere fact that all do charge the maximum permissible rates is not sufficient to show an unlawful agreement to do so. We hold that so long as respondents fully comply with the Rating Act, the mere existence of the named organizations and their relation with the Missouri Inspection Bureau as stated, and the mere fact that respondents charge the same rates and use the same rules and forms is wholly insufficient to show an agreement in violation of the provisions of the Rating Act or of the Anti-Trust Statutes. See, American Const. Assur. Co. v. O'Malley, supra, 342 Mo. 139, 113 S. W. (2d) 795, 800; Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 Sup. Ct. 174, 176.

Agreements On Maximum Commissions to Agents As A Violation of the Rating Act and the Anti-Trust Statutes.

▮▮▮ Relator insists that respondents have violated the Anti-Trust Statutes and the Rating Act in agreeing among themselves not to pay more than a fixed maximum scale of commissions to their agents, and in requiring that such agents not represent companies which do not belong to the Western Underwriters Association or the Western Insurance Bureau. Relator says that the evidence shows "an unlawful combination to lessen and stifle competition and tends toward the establishment of a monopoly."

The evidence indicates that the writing of fire, hail and windstorm insurance is a distinctive business; that insurance is written almost entirely by agents; that agents are compensated by commissions on the insurance written; that such insurance business on the books of the agent is his business; that it comes to him rather than the company; and that, if he changes company representation, he takes the business with him to the new company. There was evidence that, if commissions were not limited, business would be switched by the agents from company to company depending upon which company paid the higher commission, and such action would cause chaos in the insurance business, since companies would not know where their business would be the next month if the agent, being in control, could place it anywhere and obtain a higher commission.

As stated, the Western Underwriters Association undertakes to limit the commissions (to agents and brokers) to be paid by its members' companies. It has a maximum scale or ceiling on commissions, above which the companies cannot go in allowing commissions, and members are disciplined and fined for paying commissions greater than the scale set. This ceiling or maximum scale of commissions applies in Missouri. The companies can pay less than the maximum scale or ceiling fixed by the Western Underwriters Association but not more. The association has "full power and authority to require (as to such localities as it may designate) that no member shall enter or remain in an agency while such agency represents a company or companies whose officers, general agents or managers are not members" of the association (referred to as the clear agency provision). Only companies conforming to the rules of the association are eligible to membership in the association. The Western Insurance Bureau also has a prescribed scale of maximum commissions to agents, but only recommends that its members live up to the scale set by its rules. Non-affiliated companies are referred to as companies that do not belong to the Western Underwriters Association nor to the Western Insurance Bureau and it is stated that "in non-affiliated companies competition comes from the fact that they will go out and pay more commissions than is provided for under the rules of the Western Insurance Bureau" or the Western Underwriters Association.

The National Convention of Insurance Commissioners has frequently recommended that commissions be uniform and that a schedule of maximum commissions to agents on fire insurance be adopted. It further appears that the rules limiting maximum commissions to agents and providing for "clear agency" have long been established practices in the insurance business and without interference by the law enforcement officials of the state.

Specifically, relator insists that respondents have violated the terms of Sec. 8304 of our Anti-Trust Statutes, by entering into the understandings and agreements, as set forth in the rules of their associations, with the design to lessen and destroy competition; that respondents have violated Sec. 5972 of our Rating Act by said agreements, "which would result in the amount of commissions being paid thereunder, as having a definite influence and effect upon the reasonableness of rates based upon their experience or cost of insurance, of which commissions paid is an item"; that respondents, by agreeing upon a maximum scale of commissions to agents, have violated Sec. 5986 of the Rating Act, which was enacted for the purpose of preventing "insurance companies from fixing maximum compensation commissions for the purpose of lessening or destroying competition"; and that by these acts respondents have abused and misused their respective corporate franchises.

Respondents, on the other hand, say that joint action in placing a ceiling on commissions does not violate Sec. 8304 of the Anti-Trust Statutes because there are no agreements to limit or fix "the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm," that agreements placing a maximum ceiling upon agents' commissions do not violate any provisions of the Rating Act, particularly Secs. 5972 and 5986; and that "the joint action of the companies in placing a ceiling . . . and thereby preventing a run away, excessive and unreasonable cost of acquiring business is economically sound, and is in the public interest." The respondents contend that the rules are not intended to prevent competition, but to prevent constant disturbance of business.

We think it apparent from a mere reading of Sec. 5972 of the Rating Act that it has no possible application to the agreements concerning maximum agents' commissions or to the joint action here relied upon by relator. Sec. 5986 of the same act, also relied upon, has no application of the facts, because there is no evidence that any company pays or offers to pay "a different percentage of commissions to any agent or agents on the condition that they represent or do not represent companies belonging to the same or different associations." Nor does it appear that the clear agency provision violates either of these statutes.

In support of the contention that the agreements or joint action in placing ceilings on agents' commissions violates Sec. 8304 of the Anti-Trust Statutes, relator relies particularly upon Potomac Fire Ins. Co. v. State (Texas Civil Appeals), 18 S. W. (2d) 929, 931. That case involved the application of the detailed terms of a particular statute to the provisions of a rather extended written contract between two insurance companies. In that case it was held that a contract between two insurance companies, whereby they agreed to limit agents' commissions to a certain amount, and not to do business through an agent who accepted more than the fixed commission from any company on fire insurance business written in the state, prevented or lessened competition in the "business of insurance" and necessarily and naturally tended to fix, maintain, increase or reduce "the cost of insurance" and was violative of the Anti-Trust Laws of Texas, particularly Art. 7426 R. S. Texas 1925, prohibiting the fixing or maintaining of the cost of insurance, or the standard or figure whereby the cost of insurance shall be in any manner affected, and prohibiting agreements precluding free and unrestricted competition among companies in the "business of insurance". The court said that the agreement dealt with an item of expense "always" considered by the State Insurance Commission in fixing and determining maximum rates of premiums for insurance. A careful reading of the opinion in that case will show how much emphasis is placed upon the particular contract and statutory provisions there present, which

are wholly absent in the case before us. Section 8304 of our Anti-Trust Statutes is very different from the Texas statute there considered.

Our Section 8304 prohibits:

"All arrangements, contracts, agreements, combinations or understandings made or entered into between any two or more persons, designed or made with a view to lessen, or which tend to lessen, lawful trade, or full and free competition in . . . the price or premium to be paid for insuring property against loss or damage by fire, lightning . . . "

There is no charge here (except in connection with the bribery charge, to be discussed hereafter, or the 16 2/3 per cent rate increase, heretofore discussed), that these respondents have charged or collected any premium or price for insurance not fully approved by the Superintendent of Insurance under the provisions of the Rating Act. If Section 8304 is applicable it must be applicable to "the price or premium," so fixed or approved by the Superintendent of Insurance under the authority of the subsequently enacted Rating Act. We may agree that the respective members of the Western Underwriters Association and of the Western Insurance Bureau have agreed not to compete with each other with reference to the matter of expense relating to agents' commissions and that they will not pay commissions in excess of the maximum scale set, but no statute of this state has been called to our attention which prohibits such agreements. There is no contention that the agreements mentioned were "designed or made with a view to increase, or which tend to increase . . . the price or premium to be paid for insuring property." We hold that the agreements relied upon do not constitute a violation of the provisions of Section 8304, particularly so, in view of the provisions of the Rating Act. See, also, Harelson v. Tyler, 281 Mo. 383, 219 S. W. 908, 913.

This holding must not be construed to mean that respondents are free from control in the matter of paying commissions to agents. The Rating Act was intended to and does give the Superintendent of Insurance some control over commissions to be paid to agents. Section 5984 of the Rating Act provides that he shall take into consideration the acquisition cost and administration expense of the companies. Commissions paid to agents are conceded to be an acquisition cost. Under Sec. 5982 of the same act the companies are required, in reporting expenses, to separately state the amounts paid as commissions to agents. In the case of Aetna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65, 77, it was held that excess commissions paid to agents in the City of St. Louis, so that these agents could pay brokers who control the placing of insurance, was not to be considered in determining insurance rates. See, also, Aetna Ins. Co. v. Hyde, 34 Fed. (2d) 185, 196. The power, therefore, of the Superintendent of

Insurance to establish rates on aggregate experience, to determine whether or not "the underwriting activities of such companies are conducted on a reasonably economical basis," and to disallow excessive and unnecessary commissions, necessarily places the matter of commissions to agents under the control of the Superintendent of Insurance. Agreements providing uniform commissions to agents, therefore, in this state, in view of our Rating Act, do not tend to lessen full and free competition in the "price or premium to be paid for insuring property against loss or damage by fire, lightning or storm."

Alleged Violation of the Anti-Trust Statutes by The

## Formation of Pools.

Relator contends that respondents have united and pooled their interests together (in such organizations as the Oil Insurance Association, the Western Factory Insurance Association, the Underwriters Grain Association and the Western Sprinklered Risk Association) for the purpose of stifling competition and indulging in other practices prohibited by the Anti-Trust Statutes and the Rating Act. Relator states that it appears reasonable to conclude the activity of the respondent companies (in these associations) under the direction of the Western Underwriters Association and the Western Insurance Bureau is not on the basis of reinsurance, but is insurance under a pool and participation plan to meet the competition of the mutuals.

## The Oil Insurance Association.

The Oil Insurance Association is an association through which the insurance companies insure oil properties. The evidence indicates that the amount of insurance required in this field is so great and the hazard is such that no one company would be able, without risking financial disaster, to write a policy without reinsurance and that before the organization of this association the insuring of oil properties was in a very unsatisfactory state. Little attention had been paid to the question of taking fire prevention measures. Rates were extremely high and insurance companies did not care to have the business.

The Oil Insurance Association has in its employ engineers and inspectors. These inspect the oil properties and make recommendations to the oil interests regarding the installation of fire protection devices and changes and improvements to lower the fire hazard. These recommendations are usually followed. This practice has resulted in lower rates and the saving of much property from fire. The association has nothing to do with establishing rates. That matter is left entirely to the Rating Bureaus. The cost of maintaining the association is taken out of the premiums collected for the policies issued. The method employed in writing insurance is about as follows: An agent receives a request for a policy covering oil property to be insured, say for $10,000,000. One policy is written for the

entire amount. Each company belonging to the association is immediatly bound to the extent of the number of units it has in the association. One unit represents $5,000. Each company must have at least one unit and cannot have more than ten. The rules of the association prohibit any one company of the association from insuring such property except through the method established by the association. This measure is taken to preserve the association and to keep it from disintegrating. As we view the situation, the method of writing this class of business is simply a convenient and efficient way of reinsuring as is permitted by Sec. 5927. The latter portion of this section, after authorizing reinsurance contracts, provides that an insurance company or association may join with any such corporation in any such risk and may make and enter into all manner of contracts related to such reinsurance and joint insurance and the terms upon which the same shall be conducted. The statute expressly authorizes the manner in which oil properties are insured through this association. Relator says with reference to this point that ''There can be no question but that Respondents have violated Sec. 8302, R. S. Mo., 1939, relating to pools.'' Relator would be correct if it were not that Sec. 5927, as we held, expressly authorizes joint insurance and reinsurance contracts. This section, therefore, controls over Sec. 8302. See 59 C. J., Sec. 623, page 1056. Reinsurance contracts are in general use in this state and have long been recognized. Homan v. Employers Reinsurance Corp., 345 Mo. 650, 136 S. W. (2d) 289. Relator in his brief states that mutuals do not write this line of insurance and that one mutual that did so was forced out of business. The evidence does not show that the Oil Insurance Association, through any illegal, activities, prevents mutuals from writing such insurance or that the association had anything to do with the mutual going out of business. Perhaps the mutuals deemed the risk too great.

There are a number of associations writing this class of insurance. For example, the John G. Simmons Office; the American Petroleum Underwriters and others. We are not concerned with these in this case. We mention them merely to show that there is competition in this line of insurance.

The Oil Insurance Association is governed by articles of agreement. These articles prescribe certain conditions as to membership with which compliance is required not only to be admitted but to be maintained while a member. This being a voluntary association among insurance companies engaged in writing joint insurance or reinsurance the association for its own protection and for the safety of its members has the right to make rules and regulations as to the qualifications of its members. Companies which do not care to qualify or cannot qualify have a right to write such insurance on oil properties and to reinsure with other companies.

Western Factory Insurance Association, Etc.

There are other associations basically similar to the Oil Insurance Association. For example, the Western Factory Insurance Association, the Underwriters Grain Association and the Western Sprinklered Risk Association. In relator's brief all of these were treated as being in a class with and similar to the Oil Insurance Association. Relator charged that the Western Factory Insurance Association was created for the primary purpose of rendering the ██ similar service and contracts of insurance as offered by the associated factory mutuals. Relator cited no law which had been violated by the formation of such an association. Policies covering factories are written through this association on a basis similar to the policies written through the Oil Insurance Association on oil properties. What we have said with reference to the Oil Insurance Association also applies to these associations and further discussion of them is not necessary.

Alleged Bribery to Establish and Maintain Agreed Insurance Rates As A Violation of the Anti-Trust Statutes.

██ Finally, relator contends that respondents have violated the Anti-Trust Statutes by bribing R. E. O'Malley, Superintendent of Insurance, "for the purpose of establishing and maintaining the rates made effective on November 11, 1935"; and that "by their concerted action, they secured an increase of four-fifths of this 16 2/3 per cent increase by means of a bribe." Reference is made to the detailed evidence concerning the alleged bribery of O'Malley and to the settlement agreement of May 18, 1935. This settlement agreement, in addition to providing for the disposition of the impounded funds, provided (1) for an increase of approved rates amounting to four-fifths of the 16 2/3 per cent increase, effective from June 1, 1930 to May 1, 1935, (2) for the filing of printed 100 per cent rates, retroactive to May 1, 1935, and (3) for the subsequent filing of basis schedules on various classes. Relator also refers to the order of the Superintendent of Insurance of May 21, 1935, executed in conformity with the settlement agreement, approving four-fifths of the 16 2/3 per cent increase in fire and windstorm insurance rates from June 1, 1930, to May 1, 1935, and to the approval of the rates effective November 11, 1935.

As stated, the information charged that respondents violated the Anti-Trust Statutes and the Rating Act and bribed O'Malley to compromise and settle the rate litigation, recover impounded funds and approve new rates for insurance. It further charged that the settlement was the result of a conspiracy between respondents and the said R. E. O'Malley, Superintendent of Insurance, and others, to cheat and defraud the Missouri policyholders of respondents, and the State of Missouri, of a large sum of money, towit, $7,834,656.86, being 80 per cent of the impounded funds; and issue was duly joined.

Respondents, however, say the information does not charge "bribery to accomplish the violation of the Rating Act and the Anti-Trust Statutes of Missouri," but only charges "that the respondents bribed R. Emmett O'Malley." If respondents did, in fact, bribe O'Malley and if such bribery and fraud constituted a willful misuser and abuse of respondents' separate franchises for which the respective respondents are responsible to the state in this proceeding and for which they may be ousted or otherwise punished, the fact that respondents may have further violated the Anti-Trust Statutes by reason of such bribery would not be of major importance. Accordingly, we shall not determine whether the information charges that respondents violated the Anti-Trust Statutes by bribing O'Malley or whether respondents are guilty of such charge. We will consider rather the question of willful misuser and abuse of respondents' separate franchises by such alleged bribery and fraud.

## Part III.

#### Misuser and Abuse of Respondents' Franchises by Alleged Fraud and Bribery. O'Malley Arranges For Street to Meet Pendergast.

 The evidence in support of the charge of bribery and fraud shows that late in 1934 or early in 1935, R. E. O'Malley, Superintendent of Insurance, went to St. Louis to see A. L. McCormack, with whom he was well acquainted. There is no suggestion in the evidence that, at that time, McCormack had anything to do with the litigation pending in the state and federal courts, but he was a prominent insurance agent and, in 1933 and 1934, had been President of the Missouri Association of Insurance Agents and of the St. Louis Association of Insurance Agents. In 1935 he was a member of the board of directors of both associations. O'Malley asked McCormack if he thought the insurance companies would be interested in making a settlement of the then pending insurance rate litigation. McCormack said that he had no authority of any kind, but that if he, O'Malley, had any suggestions to offer he would be glad to convey them to Mr. Charles R. Street of Chicago, Illinois. McCormack was well acquainted with Street and had been closely associated with him in insurance matters.

Mr. Street was then Chairman of the Subscribers Actuarial Committee and respondents concede that this Committee had charge of the pending litigation "in the sense that they supervised it in an advisory way, and kept the respondents advised by oral reports made by the Committee's chairman at meetings of the Subscribers, and by bulletins sent direct to the respondents." The committee had also "advised the companies from time to time relative to the methods of making their impoundings and whatever other steps were taken in the litigation." The committee had performed similar duties in

connection with "the old restitution case in making the reports and paying judgments."

At this first meeting between O'Malley and McCormack, O'Malley suggested that Mr. Street see Mr. T. J. Pendergast and talk to him. He did not say why he wanted Street to see Pendergast. Within a few days McCormack saw Street in Chicago and told him what O'Malley had said, that is, that O'Malley wanted to know if Street would talk to Pendergast. Street said he would be glad to talk to anyone, because he was anxious to dispose of the insurance trouble in Missouri. McCormack told Street he would convey that message to O'Malley and he did so within a few days. When he reported to O'Malley, O'Malley said all right. A week or ten days later O'Malley told McCormack that Pendergast was going to be in Chicago in a few days and McCormack conveyed that information to Street. When Pendergast reached Chicago, O'Malley advised McCormack and McCormack went to Chicago and informed Street. McCormack further arranged for Street to meet Pendergast at the Palmer House in Chicago. The meeting was held prior to May, 1935. At this meeting, Street advised Pendergast that he would be willing to pay someone a fee to dispose of the litigation or help get the matter out of the way, because the chances were the cases would be appealed and there would be further delay. Later, while Pendergast was present, Street told McCormack that they had agreed on the sum of $500,000 to be paid to Pendergast (payable when the settlement was obtained) and that Pendergast was going to see what he could do toward helping to get the matter settled. Pendergast did not add anything to Street's statement. Subsequent to the meeting, Street sent word by McCormack to Pendergast that he would raise the amount to $750,000. McCormack delivered this message to Pendergast at the Congress Hotel in Chicago and Pendergast said he would do every- thing he could to expedite the matter.

Plans For Settlement Under Way.
First Conference in Jefferson City, Missouri.

In February or March, 1935, not later than the middle of March, a conference was held in Jefferson City looking toward a settlement of the insurance rate litigation. There were present at this meeting Charles R. Street and R. E. O'Malley and, also, G. C. Weatherby, Floyd Jacobs and John T. Barker, Counsel for the Insurance Department. Mr. Street made a talk in favor of a settlement of the rate litigation, said the long litigation ought to be settled and that the companies wanted it settled. The meeting adjourned with the understanding that Mr. Street would submit a proposition in writing to the Superintendent of Insurance. No such proposition was ever submitted.

Second Conference in Jefferson City, Missouri.

About the first of April, 1935, Mr. O'Malley reported that Mr. Street wanted to have a conference in Jefferson City with the Governor and others. The conference was held at the Insurance Department office on a Sunday afternoon. Mr. Street stated that:

"He didn't want to negotiate and enter into negotiations for a settlement, unless there was a possibility at least that the Governor would approve of it, . . . he wanted to have from the Governor an assurance that if a settlement could be arrived at, which in the Governor's opinion ▉▉▉ was fair, . . . that it would be approved." Street further testified the Governor "told them that he couldn't say that he wouldn't approve any compromise, that would be a ridiculous position to take, that he saw no harm in negotiating and trying to arrive at some fair compromise, that he, however, would insist that General Barker be present at the negotiations and be the attorney representing the State."

There was general discussion and Mr. Street stated that he thought the litigation should be settled. He made no definite proposition for settlement, but indicated that if a settlement were reached most of the impounded funds should be returned to the companies. Some of those present spoke in favor of a settlement of the litigation and some in opposition.

The Payment of Money to Pendergast and O'Malley.

Sometime in May, 1935, after McCormack saw Pendergast at the Congress Hotel in Chicago and prior to a meeting held at the Muehlebach Hotel in Kansas City, Missouri, on May 14, 1935, Mr. Street advised McCormack that he was sick and unable to leave Chicago and asked McCormack to do him a favor and deliver some money to Pendergast in Kansas City. McCormack agreed. The money, $50,000 in bills, was delivered to McCormack at Street's office in Chicago with directions, "Give this to Mr. Pendergast." McCormack made the delivery, as directed, and Pendergast said, "Thank you." McCormack (as Street had advised) told Pendergast that there would be more coming along. A further payment of money was made either before or immediately after the Kansas City meeting (perhaps after, but during 1935). McCormack went to Chicago at Street's request. Street delivered to him a second $50,000 in bills and asked him to deliver the money to Pendergast in Kansas City and he did so. When this sum was delivered, Pendergast took out $5000 and handed $45,-000 to McCormack, saying, "This is for you and Emmett. McCormack understood this to mean Mr. R. Emmett O'Malley. McCormack took the $45,000 to St. Louis and advised O'Malley that Pendergast had sent some money down to him. O'Malley "expressed a little surprise for the moment." McCormack further told O'Malley that he presumed half of it was for him. O'Malley raised no objections

and asked for the money in installments at various times until $22,-500 had been delivered to him. O'Malley made no inquiries about where Pendergast got the money, nor as to why Pendergast had sent the money. It was McCormack's opinion, based upon O'Malley's actions, conversation and appearance, that O'Malley understood.

Conference at Kansas City on May 14, 1935.

A further meeting was held at the Muehlebach Hotel in Kansas City on May 14, 1935. In attendance at the meeting was C. R. Street; R. E. O'Malley; J. B. Parker, Manager of the Western Actuarial Bureau and Secretary of the Subscribers Actuarial Committee; R. J. Folonie, Chief Counsel for the Insurance Companies in the rate litigation; John T. Barker, Counsel for the Superintendent of Insurance; Paul W. Terry, Manager of the Missouri Inspection Bureau, A. L. McCormack and others.

A witness stated that "the big four", Street, O'Malley, Folonie and Barker, argued the terms of settlement, including rates, coverages and forms, all day. Parker and Terry were present at Street's direction as consulting rating experts. Previous to the meeting, Street had advised Folonie that "the settlement of the cases had reached a point for personal discussion"; that Folonie should attend the Kansas City meeting, but that he, Street, was entirely qualified to handle the settlement himself and that he didn't want any interference from Folonie. Street said if he wanted any advice or help he would ask for it. Folonie had been connected with the rate litigation since January, 1922, and had acted at the request of the Subscribers Actuarial Committee and the Missouri Inspection Bureau in "initiating and instituting the 16 2/3 per cent rate suits." He had at all times sent bills for services directly to the Subscribers Actuarial Committee, although payment was made by the Missouri Inspection Bureau. The firm of Bates, Hicks and Folonie had been originally employed in 1922, by Mr. Terry of the Missouri Inspection Bureau, at the suggestion of Mr. J. B. Parker, Manager of the Western Actuarial Bureau and Secretary of the Subscribers Actuarial Committee.

During the course of the meeting in Kansas City, Street asked Folonie, Parker and Terry to leave the conference room. According to Mr. Terry; Street, O'Malley and McCormack remained in the conference. Later that day Street reported to Folonie and others that a settlement had been agreed upon and he gave the terms of the agreement. Thereafter, Street left for Chicago, and Mr. Folonie and General Barker remained in Kansas City and worked together, "trying to put on paper the settlement agreement that Mr. O'Malley and Mr. Street said they had arrived at." In drafting the form of the agreement, Folonie found it necessary to consult Street by telephone because Folonie had an incomplete knowledge of the settlement agreement.

The agreement, as finally reduced to writing, purported to be an agreement "between R. Emmett O'Malley, Superintendent of the Insurance Department of the State of Missouri, and Charles R. Street, as agent for the stock fire insurance companies, parties to the rate litigation in the United States District Court for the Western District of Missouri and in the Circuit Court of Cole County, Missouri." It was signed: "C. R. Street, Agent for stock fire insurance companies parties to rate litigation"; "Robert J. Folonie, Attorney for Insurance Companies"; "R. Emmett O'Malley, Superintendent of Insurance"; and "John T. Barker, Attorney for Superintendent". The agreement was signed by O'Malley and Barker on May 18, 1935, and was dated accordingly. It was subsequently signed by Street and Folonie on May 21, 1935.

### Terms of the Agreement.

As stated, the settlement covered: (1) The disposition of the pending cases, (2) the disposition of the impounded funds, and (3) the approval of new fire insurance rates. Particularly, the Superintendent of Insurance agreed: (1) To set aside the order of May 28, 1930, disapproving of the 16 2/3 per cent rate filing increase of December 30, 1929, (2) to make a new order, "retrospective" to June 1, 1930, approving four-fifths of the rate increase and disapproving the increase to the extent of one-fifth, and (3) to join the companies in seeking appropriate court orders disposing of the impounded funds, one-fifth to the Superintendent of Insurance for payment to the policyholders, one-half to the insurance companies and the remainder (30 per cent) to named trustees, as representatives of the companies, towit, to "Robert J. Folonie, Counsel for plaintiffs in said suits, and Charles R. Street, Chairman of the Committee of the companies supervising such matter on behalf of the companies, as a payment and discharge to that extent of any obligation of return thereof to the insurance companies . . ." The agreement further provided for the trustees to pay $200,000 from said funds to the superintendent, as reimbursement for certain expenses in the rate litigation, and to further pay $500,000 to John T. Barker, as the attorney fees and expenses of the attorneys representing the superintendent in the rate litigation. The insurance companies agreed, through the Missouri Inspection Bureau, to file printed rates (referred to as the 100 per cent rates) retroactive to May 1, 1935, in substantial conformity to the order of the superintendent, and, subsequently, to "file basis schedules on various classes, . . . which when applied and in conjunction with other basis schedules as printed will produce a rate level not to exceed 97.6 per cent of the printed rates."

### Further Payment of Money.

After the second $50,000 was delivered to Pendergast, no further payment was made until March or April, 1936, when Street sent for

McCormack and delivered to him $330,000 in bills and asked him to give it to Pendergast. McCormack took the money from Chicago· to Kansas City and delivered it to Pendergast at his home. McCormack and Pendergast counted the money and found there was $330,000, as Street had stated to McCormack. Pendergast handed McCormack $80,000 in bills and gave him to understand that he was to divide with O'Malley. McCormack took ▇▇ the money to St. Louis and gave $40,000 to O'Malley. Street later, by check, paid McCormack's expenses on the several trips from Chicago to Kansas City. On April 16, 1936, Street sent $20,000 to McCormack, which McCormack retained for himself, although he did tell ·O'Malley about it. Thereafter, sometime in October of 1936, O'Malley told McCormack that Pendergast was ill and in need. O'Malley wanted to know if McCormack would help Pendergast out. McCormack said he would try. Shortly thereafter, McCormack went to Chicago and told Street, and Street said he couldn't do it right away, but he would try to get it and send it down to McCormack. Subsequently, in the fall of 1936, Street· did send $10,000 to McCormack at St. Louis and McCormack took the money to Kansas City and delivered it to Pendergast at the hospital. According to the evidence, a total of $440,000 was delivered to Pendergast. Out of this sum O'Malley and McCormack each received $62,500 and McCormack further received and retained an additional $20,000 forwarded by Street. Respondents concede that ''Street did deliver money to McCormack for payment to Pendergast, and at Pendergast's request, McCormack divided some of that money with O'Malley,'' but they deny ''that Street knew O'Malley was receiving any of the money.''

Where and How the First $100,000 was Obtained.

(a). New York Meeting, May 2, 1935.

A meeting of insurance executives was held in the Board Room of the Insurance Executives Association in New York, on May 2, 1935. Street had wired Mr. Haid, President of the Association, that he desired to meet certain named executives on that date, and Mr. Haid had telephoned them and requested their presence. When all had assembled, Street advised them there was a possibility of settling the Missouri litigation on the basis of 90 per cent of the impounded funds to the companies and 10 per cent, to the policyholders. He said there was an urgent demand for a settlement of the litigation and that he had had some discussion with officials in Missouri and they were willing to compromise. There was some evidence that Street also referred to ''a powerful person in Missouri.'' Street said he would have to have $100,000 to pay legal expenses ''in connection with the termination of the litigation''; that he would probably need more, he didn't know how much; that he wanted the New York and Hartford companies to advance this fund; and that they would be given credit for the

amount advanced, when all were called upon to pay their pro rata part of the sum necessary. No one asked, and Street did not say, what the legal expenses were, who he was dealing with, or why the money was needed in advance. Street stated that one man, could handle the negotiations for a settlement better than a committee, because a committee meant delay and, anyway, he felt he could do it better than anyone else. He said he would have to have command of the funds for necessary expenses incurred in the negotiation of the settlement and would need to be placed in a position to act for all of the companies in the suit. Street said that, if the companies had sufficient faith in him to permit him to undertake a settlement in their behalf, he believed he could do it. The meeting was very short. Street asked what they thought about a settlement on the basis stated and all indicated they were in favor of it. He told them he would go to Hartford the next day and, if the companies there approved the compromise, he would "proceed to effect it." He then wrote down the amount he expected the respective parties to advance and they agreed to advance the money. Street said he wanted the money "as quickly as possible," and he instructed that checks be made payable to Folonie, to Street and Folonie, or to Street; and that they be sent to the Insurance Executives Association office. One group of companies represented at the meeting was not requested to make and did not make an advance contribution, but subsequently made payment of 5 per cent of its impounded funds. One group, not represented, made an advance at Mr. Haid's request. The total advances received by Mr. Haid amounted to $62,500 and the checks and accompanying letters, if any, were forwarded to Mr. Street at Chicago.

(b) Meeting at Hartford, Connecticut, May 3, 1935.

A further meeting of insurance executives was held in Hartford, Connecticut, on May 3, 1935, the day following the meeting in New York. Street had phoned one of the executives and asked him to call a meeting of insurance executives "in authority". When the executives assembled, Street discussed the rate litigation in Missouri. He said that competition, charging less rates, was displacing business and disturbing everyone; that no decision had been handed down in the Missouri rate litigation, "which had dragged on since 1929"; that, according to his information, "the case would probably go against" the companies; and that he had reason to believe a favorable compromise could be obtained, giving 90 per cent to the companies and 10 per cent to the policyholders. Street said that Folonie had been fighting in Missouri so many years that he was not the man to negotiate a compromise; that he, Street, needed additional and local counsel; that the Subscribers Actuarial Committee had no funds; and that he had to have the funds, if he acted in the matter. Street asked the privilege of negotiating this settlement individually. He said he thought he could settle the case and he asked them to trust him, be-

cause, "you cannot compromise a case in a town meeting". He further said that he did not know what the cost would be, but thought he should have an initial fund of $100,000; that he had obtained $60,000 at the New York meeting; that there would be an accounting of the money advanced; and that the total cost would be prorated among all the companies. When asked what he was going to do with the money, Street said: "Do you trust me?" All agreed that they did. Street stated the amount of money he wanted from each of the several companies represented. Most of those present agreed to make and made the advances. The checks were collected by one of the executives and, later, forwarded to Street in Chicago. A memorandum of the meeting was made by one of the executives. It indicated that the settlement proposed would return 80 per cent of the impounded funds to the companies, 10 per cent to the public and 10 per cent would be used for expenses. After a date to be fixed, maybe March 1, the premium rates in Missouri would be the 100 per cent rates, that is, the rates in effect before the 10 per cent Hyde reduction order was made. The memorandum further stated:

"We were asked to contribute as an advance for legal expenses the sum of $37,500 . . . $62,500 was raised among a few of the New York Companies on Thursday. Mr. Street is to turn this money over to our attorneys, Hicks & Folonie but it is not to be delivered unless the settlement, as above referred to, is effected." The names of the companies making advances and the amounts advanced were listed on the memorandum.

The total amount of the checks received by Street from the companies in New York and Hartford was $100,500. The checks were payable either to Street, Folonie, or Hicks and Folonie. On May 10, 1935, Street took the checks to Folonie and had them endorsed and cleared through the firm bank account of Hicks and Folonie. Street asked for, and received in return, three checks from the law firm of Hicks and Folonie. One check was for $50,000, payable to Mr. Hicks, from whom Street had obtained $50,000 on May 9, 1935, and the balance in two checks payable to C. R. Street, one for $50,000 and one for $500.

## Other Facts.

The minutes of the Subscribers Actuarial Committee, as taken by J. B. Parker, secretary, on March 19, 1935, with reference to the 16 2/3 per cent rate litigation in Missouri, shows the following entry:

"It was voted the sense of the meeting that the Chairman be authorized to proceed with the conferences in the manner outlined during the discussion and report back to the committee at a future meeting the results of such further conferences. In other words, the conferences which he has had were approved, and he was requested to proceed with those contemplated 'with power'."

1102

Mr. Street was then chairman of the committee.

The minutes of a meeting held on July 9, 1935, after the settlement agreement was signed, but prior to the time it was carried into execution (the decree of the Federal Court based upon the settlement was not entered until February 1, 1936), show the following entry:

"The reports received from Attorney Folonie from time to time on the progress of the settlement negotiations was presented in detail, and his report of July 6th was read by the Chairman, following which the Chairman explained some of the ramifications of this controversy and asked for the continued support of the committee in handling this matter. After discussion it was voted the sense of the meeting that the Chairman be authorized to continue to conduct these negotiations along whatever lines seem expedient."

After the conference in Kansas City, on May 14, 1935, Street went to Chicago, as stated, and on May 16, before the settlement agreement had been reduced to writing or had been signed, he wired a Mr. Koop, one of the New York Insurance Executives, that the 90 per cent settlement, as originally proposed, was impossible; and that only an 80 per cent settlement was possible. He briefly outlined the settlement and recommended its acceptance and asked that the other executives be advised. Street was subsequently notified by Mr. Erskine, Secretary of the Insurance Executives Association, that certain of the executives, Street had mentioned, approved the proposed settlement. Others reported directly to Street. On the same day that Street wired Mr. Koop in New York, he also wired one of the Hartford executives, a Mr. Long, and asked that the other executives be contacted on the new basis for settlement. Most of them were contacted and approved the proposed settlement before it was actually signed.

Notices to the Companies Concerning the Settlement.

As stated, it is admitted that the Subscribers Actuarial Committee kept the respondents advised concerning the Missouri rate litigation "by oral reports made by the Committee's chairman at meetings of the subscribers and by bulletins sent direct to the respondents." According to a member of the committee, it advised the companies what was going on. Specifically, the record shows that this committee notified the respondents by bulletin, dated May 29, 1935, concerning the Missouri Rate Case Settlement, towit, that "The settlement is a compromise between the positions of the state and the companies both as to future rates and as to impounded money." On February 4, 1936, a few days after the Federal Court in Kansas City approved the settlement of the rate litigation, the Subscribers Actuarial Committee notified the companies concerning the "Missouri Rate Case Federal Court," in part, as follows:

(1) "The disposition of the case, as stipulated by the parties, is confirmed.

(2) "No policyholders having intervened, distribution is made according to the terms of settlement.

(3) "On all policies effective June 1, 1930, to April 30, 1935, the title to the impounded fund is confirmed, 20 per cent to policyholders and 80 per cent to companies, of which 50 per cent is to be sent to them, directly, and 30 per cent to C. R. Street and R. J. Folonie, trustees.

. . . .

(10) "The money coming into the hands of C. R. Street and R. J. Folonie, trustees, will be employed to discharge any debts incurred by or under the direction of this committee; agreed amounts payable to the Superintendent of Insurance and for his counsel; court costs; Custodian's fees; attorneys' fees and expenses of counsel for the companies; costs of administering and safeguarding money in the hands of the trustees; contingent allowances or charges; any remaining balance subject to distribution to the companies will not, in the nature of the matter, be finally and completely distributable for some time to come."

With reference to the companies who were not represented on the Subscribers Actuarial Committee by one of their chief officers, and did not have a chief officer in attendance at either the New York meeting, on May 2, 1935, or at the Hartford meeting, on May 3, 1935, respondents state: Some of these companies learned about the settlement "from the bulletin ▊ of the Missouri Inspection Bureau, dated June 12, 1935; others did not know about the settlement, or anything about its terms, until they received the bulletin of the Subscribers Actuarial Committee, dated February 4, 1936. All of them, at some time after the settlement was consummated, learned about it, and when, after the decree in the Federal Court of February 1, 1936, 50 per cent of their impoundings was distributed to them, they accepted it. In fact, it may be said that all of them, in the sense that they did not repudiate the settlement when they learned of it, accepted it whenever they learned of it."

Meeting in New York in March, 1936, and Method Used in Obtaining
Funds for Further Payments to Pendergast and O'Malley.

In March, 1936, Street notified Mr. Haid of the Insurance Executives Association in New York to call a meeting of certain insurance executives. The meeting was arranged and held in the offices of that association. Street explained to those present that a distribution, to the extent of 11 per cent of the impounded funds, was being made from the funds in the hands of the trustees, who had received 30 per cent of the impounded funds under the terms of the settlement; and that, upon delivery of the 11 per cent checks of the trustees to the companies, he wanted a check back from each of the companies, payable to C. R. Street, Agent, for 5 per cent of their impounded funds,

1104

less the amounts which they had advanced previously. With the assistance of Mr. Haid and Mr. Erskine this procedure was followed. Substantially the same procedure was followed at Hartford and elsewhere, either directly or indirectly, and a total of $347,582.64 was collected by Street from the various companies, in addition to the $100,500 collected in 1935. Six of the checks were made payable to Folonie, Agent. They were retained until the fall of 1936, when Street secured Folonie's endorsement (as hereinafter mentioned), cashed the checks and sent $10,000 to Pendergast by Mr. McCormack. Respondents admit that:

"The 5 per cent assessment was collected from all the companies represented at the May 2, 1935, meeting at New York, and from all the companies represented at the May 3, 1935, meeting at Hartford."

The evidence further shows that all other respondents also paid the 5 per cent assessment.

*Findings.*

(a) Bribery and Fraud.

Respondents contend there is no "evidence in this record showing the willful bribing of a public official by any respondent." It is insisted that "Street's payment to Pendergast for his influence was reprehensible and sordid, but it was not bribery." Respondents further say there is no evidence that Street knew Pendergast intended to pay or did pay O'Malley, or that Street knew O'Malley was receiving any of the money.

There is little or no conflict in the evidence concerning the acts and conduct of Street in collecting and paying the sums of money as hereinbefore set forth. In their briefs and oral argument counsel for respondents, in effect, concede many of the essential facts shown by the evidence. Respondents only disagree with relator upon the conclusions to be drawn from the facts shown in the evidence.

As stated, respondents concede that Street delivered money to McCormack for payment to Pendergast, and at Pendergast's request McCormack divided some of that money with O'Malley. In their "Statement of Ultimate Facts" respondents say:

"Street deceived the executives of all of the companies. He concealed from the members of the Subscribers Actuarial Committee the fact that he had been in conference with T. J. Pendergast and had agreed to pay Pendergast $500,000 for his influence in bringing about a settlement. He concealed from the New York and Hartford companies that at the request of Mr. O'Malley he had seen Pendergast and had agreed to pay Pendergast $500,000. . . . When these companies, as well as all of the other companies involved in the Federal Court litigation, learned that Street had made an improper use of money in connection with the settlement they voluntarily restored the 80 per cent of the impounded premiums . . . ."

Respondents further contend that they "knew nothing of Street's wrongful agreement to pay Pendergast, knew nothing of Street's payment to Pendergast when they paid Street 5% of their impounded premiums in March and April, 1936"; that "none of the respondents had any knowledge of Street's wrongful acts until 1939"; and that Street perpetrated a fraud upon all of the companies and lied to them about the purpose for which he wanted the money. It is apparent from these and other statements that respondents do not seriously question the evidence concerning Street's conduct, but they deny that the evidence shows that Street bribed O'Malley. Respondents further totally disclaim all responsibility to the state in this proceeding for the acts and conduct of Street whether such acts constitute the willful bribery of a public official or the participation in a conspiracy to cheat and defraud policyholders and the state.

We have heretofore stated the facts with reference to the insurance rate litigation, which had been pending in the state and federal courts for a number of years. We have reviewed the evidence concerning O'Malley's official position in the state and his relationship to that litigation, the purpose of the litigation, the fact that O'Malley saw McCormack and asked if he thought the insurance companies would be interested in making a settlement of the litigation, the message to Street about seeing Pendergast, the report to O'Malley, the subsequent messages concerning Pendergast's presence in Chicago, the arrangement for the conference between Street and Pendergast, the subsequent payment of money and its disposition, the making of the settlement, the distribution of the impounded funds and the approval of new insurance rates in Missouri. Other detailed evidence in the record in support of the charge of bribery and fraud need not be reviewed. In seeing and dealing with Pendergast, at the request of O'Malley and under the facts and circumstances shown by the record, Street was dealing with O'Malley and Street's payments to Pendergast were payments to O'Malley. The evidence, which we have set out above, establishes to our complete satisfaction that Street willfully bribed O'Malley to settle the pending litigation, to permit the recovery of 80 per cent of the impounded funds and to approve the new schedule of insurance rates in Missouri. Every essential element of the crime of bribery has been fully established by competent evidence. It is clear that O'Malley, McCormack, Street and Pendergast knowingly, willfully and intentionally participated in the fraudulent transaction. Whether or not any one, or all of the respondent companies, through Street, or any other agent or official, participated in the bribery and fraud, in a sense and to an extent necessary to make them responsible to the state in this proceeding for willful misuser and abuse of their separate corporate franchises, is a matter which we shall subsequently determine.

██ (b) Street's Authority to Negotiate a Compromise Settlement of the Rate Litigation on Behalf of Respondents.

The next question is whether, at the time of negotiating the settlement of the rate litigation on behalf of all of the respondents, Street was in fact the duly authorized agent of the respondents for the purpose of negotiating that settlement. Respondents, in their brief, in discussing the question of Street's authority to make a settlement, divide the companies into four groups. First, those whose officers were members of the Subscribers Actuarial Committee; second, those whose officers were represented at the meeting in New York, on May 2, 1935; third, the companies represented by officers at the meeting in Hartford, on May 3, 1935; fourth, all other respondent companies not included in the first three groups.

Respondents concede that the companies represented at the New York and Hartford meetings, being groups two and three, with the exception of four named companies, expressly authorized Street to make a settlement of the rate litigation on their behalf. Respondents also concede that a number of companies, whose officers were members of the Subscribers Actuarial Committee, ██ expressly authorized Street to compromise their cases. These particular companies were represented at either the New York or Hartford meetings. Respondents, however, insist that a number of the companies, whose officers were members of the Subscribers Actuarial Committee, did not authorize anyone to settle their litigation; and that all of the fourth group at no time extended such authority to Street or anyone else. It is further insisted that the companies who expressly authorized Street to compromise and settle their litigation cannot be held responsible for the bribery and fraud because none of them had any knowledge of Street's nefarious deals; and that Street's fraudulent and unlawful use of money to obtain a settlement of the cases was beyond the scope of his authority. We will treat this question later in the opinion.

The evidence in this case has convinced us that when Street negotiated the compromise he was acting authoritatively on behalf of all the respondents; that the Subscribers Actuarial Committee was in complete control of the rate litigation in Missouri, acting for all respondents; that this committee authorized Street to negotiate a compromise; and that, therefore, Street had full authority to settle the rate litigation. In support of these conclusions we desire to point out some evidence which must be considered in connection with all other facts heretofore stated. In the first place the Subscribers Actuarial Committee did in fact control the litigation from its inception to its conclusion. It must be kept in mind that this rate litigation affected all of the respondents as well as many other companies doing business in Missouri. The individual companies did not attempt to direct the attorneys handling the cases. Such a course would

have resulted in utter confusion. In view of the fact that a large number of companies were interested in the litigation and one hundred and thirty-seven separate suits were pending in the federal court, it was practical and good business to leave the matter in the hands of a committee, in this case the Subscribers Actuarial Committee, and that is what was done. Mr. Folonie, the recognized leading attorney for the insurance companies through all this litigation, testified that in 1923, Mr. Ives was Chairman of the Subscribers Actuarial Committee. Note the complete instructions Folonie received from Mr. Ives. Folonie testified as follows:

"In the fall, in October, 1922, there was another rate order entered of 10 percent reduction. I counseled a little in that but took no active part in it and went into a hospital about the time the order was entered and was in the hospital that winter and entered into the lawsuit myself in June, 1923. On entering into it I was instructed by Mr. Ralph Ives, who was then the Chairman of the Committee who preceded Mr. Street, that the objective of the litigation was to secure a declaration of the underlying methods of setting up a proper account with the state as to profit and loss and that their predicate was earned premiums as income, incurred loss and expense as outgo as the principal items. The attitude of the state was it was to be written premiums and paid losses and expenses primarily. I was then advised that the money involved in it was entirely secondary to establish that principle, to take it to the highest court I could take it, preferably the Supreme Court of the United States to have the principle of accounting settled because it made trouble in every state."

When Street was made chairman he too gave Mr. Folonie some instructions. Note Mr. Folonie's evidence on this point:

"Until six years, more or less, before this so-called settlement, I made annual reports to the insurance companies at their annual conventions of progress of rate litigation as their chief counsel. Some five or six years before 1935, commencing perhaps in 1930, more or less, I was instructed by Mr. Street that I was to make no reports to the companies; I was not to communicate with the companies except through him, and that he would handle the litigation."

The instructions of both Ives and Street were followed. On February 4, 1936, the Subscribers Actuarial Committee notified respondents of the settlement and in this notice appears the following: ▮ "The money coming into the hands of C. R. Street and R. J. Folonie, trustees, will be employed to discharge any debts *incurred by or under the direction of this committee.*" (Italics Ours.)

On June 19, 1935, *each of the respondents* individually filed in the federal court at Kansas City, Missouri, a stipulation signed by the attorneys for the insurance department and by the attorneys for the insurance company. This stipulation provided in substance that

the company have leave to file its motion for judgment in accordance with the settlement agreement. In the stipulation we find the following statement: That the 30 per cent "be delivered to Robert J. Folonie, one of the counsel for plaintiff, and Charles R. Street, Chairman of the Committee for the insurance companies, who, for them, are supervising this litigation." On December 12, 1935, $150,000 was borrowed to pay Folonie's fees. Under the direction and supervision of the Subscribers Actuarial Committee a note was executed, signed by the Missouri Inspection Bureau, by Paul W. Terry; Paul W. Terry and Charles R. Street personally, and note this, by "Charles R. Street, agent for the Stock Fire Insurance Companies parties to the rate litigation in the U. S. District Court for the Western District of Missouri and in the Circuit Court of Cole County, Mo." This note was later paid by the trustees out of the 30 per cent held by them.

Mr. Terry, of the Missouri Inspection Bureau, consulted the Subscribers Actuarial Committee before the suits were filed on behalf of each of the respondents in the federal court. Mr. Terry did not deem it necessary to consult anyone else.

Members of the Subscribers Actuarial Committee testified that the committee authorized Street to enter into negotiations for a settlement.

Mr. George H. Bell, a member of the committee and connected with a number of respondent companies, testified that the Subscribers Actuarial Committee was handling·the litigation for all companies and for his companies and further stated: ". . . certainly, the committee did give Mr. Street sole authority to negotiate a compromise settlement of that litigation."

Mr. Ernest A. Henne, connected with a number of respondent companies and a member of the committee, testified: "As a member of the Committee, yes; we authorized him to negotiate. . . . Q. For and on behalf of your companies? A. On behalf of all the litigants, including my own, yes, sir."

Mr. Walter D. Williams, insurance executive and a member of the committee, testified that the committee had been in charge of the litigation "in a very general sort of way, as it has charge of all matters of common interest, such as litigation."

Mr. Herbert A. Clark, also a member of the committee and an insurance executive, testified he was present at a meeting of the committee, on March 19, 1935, and that Street was then authorized to continue his efforts to negotiate a settlement. We have seen that J. B. Parker, secretary of the committee, took notes concerning the action of the committee, on March 19 and July 19, 1935, with reference to delegating authority to Street. The above evidence confirms the accuracy of these notes which disclose that the committee did give Street authority to settle the litigation.

After Street had been authorized by the Subscribers Actuarial Committee to settle the litigation and after he had been negotiating for a settlement with various officials of the State of Missouri, he went to New York and Hartford and on May 2 and 3 raised $100,000 in cash. It is evident from the record that the primary purpose of Street going to New York and Hartford was to raise money and not to secure authority to settle. Street did inform those present when he collected the money that he had been negotiating for a settlement and that he thought he could settle on a basis of 90 per cent to the companies and 10 per cent to the policyholders. He emphasized, however, that he needed money to make the settlement and needed it immediately. Many of the companies from whom he received donations at that time had western departments which had · jurisdiction over Missouri. Street, however, in this instance ignored these western departments, went directly to the higher officials in the east and secured the initial fund of $100,000. Since Street had informed these companies that he thought he could settle on the basis of 90 per cent to the companies and had collected the $100,000 on that theory, he of course thought it was necessary to notify them and ask them for their approval when he settled on an 80-20 basis.

Where a principal has permitted a person to act for him as agent over a period of many years and has recognized the agency, accepted the benefits thereof and at no time repudiated the agency, then such agency may be implied. (2 C. J. S., Sec. 23 (d) (e) (f), pp. 1048, 1049.) All the respondents permitted the Subscribers Actuarial Committee to handle and control the litigation and accepted the benefits. In this case, however, we need not rely upon that principle of law. We find that many insurance executives, representing respondent companies placed in group four in respondents' brief, which companies it is claimed did not authorize the Subscribers Actuarial Committee to handle the litigation or Street to settle the controversy, gave evidence to support our conclusions. Each of the following witnesses were officers of companies in the fourth group. We have heretofore outlined how in March and April, 1936, Mr. Haid and Mr. Erskine aided Street in collecting 5 per cent of the impounded funds from these respondents. Many telephone calls were made and many of the executives were seen in person by Street, Haid or Erskine. Some were contacted by letters. We note in the record a letter written by a Mr. Dominick to a Mr. Hewett in charge of· the Western Department of the Old Colony Insurance Company. The letter contains the following:

"Evidently it was extremely urgent, as we had a telephone call this morning from a Mr. Erskine of Haid's office (Insurance Executives Association). He dictated the following message:

" 'To facilitate the transaction, Mr. C. R. Street, *who as you know has personally directed the rate litigation in Missouri,* has asked us

to transmit to you an additional payment amounting to 11% of the total amount of impounded premiums as of May 1, we to forward two checks at once, one is for the Boston and the other is for the Old Colony, total amount of the two being $13,413.73." (Italics Ours.)

Mr. James D. Smart testified that when Mr. Haid telephoned asking for the 5 per cent he stated: "Mr. C. R. Street, as you know, has directed the rate litigation." The significance of this evidence is that pursuant to these calls the respondents, without further question, made their checks payable to Street as agent. In other words, it was conceded by all that Street, as Chairman of the Subscribers Actuarial Committee, was in charge of the litigation. However, we find in the record even more direct evidence from executives of this group of companies. Ronald R. Martin testified that the Subscribers Actuarial Committee was directing the litigation and "as long as I was satisfied with it I was willing to continue." Laurens R. Bowden testified his companies went along with the other companies and "we approved to go along with the other companies."

Mr. Harry G. Casper was asked:

"Q. Did he, (Erskine) tell you why he wanted you to pay it to C. R. Street? A. He did not and I did not ask. That seemed a very natural request in Mr. Street's capacity as chairman of the Subscribers Actuarial Committee."

Mr. Sheldon Catlin testified that the litigation was being handled by some committee headed by Mr. Street. Mr. John P. Rodgers testified about the Subscribers Actuarial Committee as follows:

"Well, we were following instructions that were sent to us in bulletins, as I say, as to the method of filing the schedules and paying over the premiums and that sort of thing, and we were using that service as a guide for what we were to do in the matter."

Everett W. Nourse, when testifying, stated what we deem was about the true situation with reference to all of these respondents. We quote the following from his evidence:

 "Q. Well, I understood you to say that the Subscribers Actuarial Committee were not connected with your organization, your companies in any manner? A. Except in a general way as supervising for us affairs that we couldn't handle directly.

"Q. Well, then was the matter of conducting litigation that grew out of the Missouri rate controversy a matter that you could not handle directly? A. Yes, we were not equipped to handle it.

"Q. You were not equipped to handle it; and therefore the Subscribers Actuarial Committee handled all of that matter for your group of companies? A. Yes."

Hart Darlington, when asked what he knew about Street handling the rate litigation, testified:

"I know as a member of the Subscribers Bureau he was in charge of the Missouri litigation.

"Q. You mean as a member of the Subscribers Actuarial Committee? A. Yes. For us."

Mr. T. J. Irvine testified that the Subscribers Actuarial Committee supervised the rate litigation in Missouri for his companies. We could go on and quote much more evidence supporting and corroborating the above, but we deem this unnecessary. All of the respondents in this fourth group, as well as the other respondents, paid 5 per cent to the fund used by Street, knowing at the time that Street had acted for them as agent in bringing about the compromise.

The conclusions to be drawn from the evidence we have outlined are: That the Subscribers Actuarial Committee had complete and unrestricted authority to supervise, control and terminate the rate litigation in Missouri for and on behalf of all of the respondents; that that authority was recognized by all of the companies; that the Subscribers Actuarial Committee, with knowledge that Charles R. Street was negotiating for a settlement of the rate litigation, delegated to him full authority to make a settlement of the litigation; that such settlement was duly made and the authority to make it was at no time questioned by any respondent. It further appears that respondents, throughout the period of the rate litigation, from its inception in 1922 to its conclusion, wholly depended upon the Subscribers Actuarial Committee to act for them in directing the course of this litigation and by their acts and conduct gave to this committee full and complete authority to compromise and settle the litigation. Even after this committee had authorized Street to negotiate the settlement and after the settlement was entered into, all of the respondents recognized the authority of Street to act for them in the matter. They did not question his agency in connection with the termination of the litigation, the terms of the settlement, the disposition of the impounded funds, the establishment of new rates, or the levying of assessments for expenses and the payment of the same directly to Street as agent. It, therefore, appears that at the time Street bribed O'Malley to make the settlement he was the duly authorized agent of all of the respondents to make the settlement; that he was acting for and on behalf of all of the respondents in accomplishing the purposes sought by the litigation; and that he was acting in the furtherance of respondents' business by virtue of the authority given to him as agent.

(c) Liability of Respondents for the Acts of Street.

Should the respondents be ousted, fined or otherwise punished in quo warranto for the acts of Street? Were the fraudulent acts of respondents' agent in bribing O'Malley the acts of the corporations so as to constitute the willful misuse and abuse of respondents' separate corporate franchises? Respondents contend that an act to constitute a ground for ouster in quo warranto must be a willful, intentional act; that the charge here is bribery; and that the evidence fails to show bribery, because there was no showing of specific intent,

or conscious knowledge of the commission of any wrongful act on the part of any corporate respondent. They insist that an essential element of bribery is lacking. Respondents' theory is that, in order to make out a case in quo warranto against any respondent, relator must "prove that all of the elements of bribery" were present, not only ▉ as to the agent who did the bribing, but that the acts of bribery and fraud were the willful and intentional acts of the corporate principals acting through a chief officer. Respondents concede that "conspiracy and fraud may be established by circumstantial evidence," but they insist that acts of misuser must be willful and repeated with full knowledge of unlawfulness. The issue of repeated acts of bribery and fraud, however, was ruled against respondents in the preceding opinion in this case, wherein it was held that the allegations in the information, concerning bribery and fraud, sufficiently stated an independent ground of ouster. 140 S. W. (2d) 36, 39, 40 (2). Respondents further say that "the authorization of the New York and Hartford companies to Street to settle their litigation was to use lawful means to effect a lawful purpose"; that "in agreeing to pay Pendergast, and in paying Pendergast, Street was not acting within the scope of his authority to settle . . . and, therefore, his wrongful acts are not binding upon those companies"; that "a principal is not affected by his agent's knowledge that he, the agent, has done or intends to do an unauthorized, unlawful act"; and that the knowledge of the alleged agent of his unauthorized act cannot be imputed to his principal to satisfy the requirement of knowledge by the principal.

We think it is wholly immaterial whether respondents participated in the crime of bribery so as to have incurred criminal liability for the acts of Street. This is a civil and not a criminal action. While the information in quo warranto, upon which the cause was tried, directly charged that respondents bribed O'Malley to obtain the settlement, it further charged that the facts alleged constituted a fraud; that respondents entered into a conspiracy and combination to cheat and defraud the policyholders and the State of Missouri and, in effect, charged that respondents were directly responsible to the state in quo warranto, not criminally for the alleged crime, but because the facts charged constituted a misuser and abuse of respondents' separate corporate franchises. The relief sought was that respondents be ousted from the state or otherwise punished, not that they be punished for any alleged crime.

In the case of State ex inf. Hadley, Atty. Gen. v. Delmar Jockey Club, 200 Mo. 34, 71, 92 S. W. 185, 98 S. W. 539, l. c. 543(3), although the penalty recommended by Judge GRAVES in Part III of his opinion was not imposed, the language there used is consistent with Part II and correctly states the rule, towit:

"The implied contract with the State, when the charter was given respondent, was that it would exercise and use the granted rights; that it would use none other, or, stated otherwise, that it would not usurp other rights; that it would rightfully use the powers granted and not misuse them. . . . The gist of each (misuser and usurpation) in quo warranto is the willful violation of the rights of the State under the implied contract, and not the violation of some criminal law, for we do not try criminal cases and affix criminal punishments in quo warranto proceedings. The violation of a corporation's contract with the State by misuser or usurpation may be evidenced by the fact of the violation of some statute, criminal in character, but in this kind of proceeding we try the right of the corporation to further hold its franchises, not the question of finding its guilt or innocence under the statute and fixing punishment permitted by the statute. It is the only way the State has of preventing the abuse of the confidences it has reposed in these corporate creatures which are of its own making."

See also, Delmar Jockey Club v. Missouri ex rel. Atty. Gen., 28 Sup. Ct. 732, 735.

It was not necessary for the information to charge that the misuser and abuse of respondents' separate corporate franchises was by reason of the acts of the respondents' agent or agents, because being corporations the acts charged had to be done, if at all, by an agent or agents of the corporations charged. Haehl v. Wabash Ry. Co., 119 Mo. 325, 343, 24 S. W. 737, 741. The question is, therefore, whether respondents ▮▮▮ are responsible to the State in quo warranto for the fraudulent acts of Street in bribing O'Malley to accomplish the purposes heretofore stated.

As mentioned, respondents contend that they did not know of, authorize or sanction the fraud and bribery; that Street defrauded the companies he represented; and that he misrepresented the facts when dealing with the executive officers of the several respondents. In determining whether these contentions constitute any defense in this proceeding, we first consider certain well established general principles of law concerning the liability of a corporation to third persons for the willful or malicious torts of its agent, committed while the agent was in the prosecution of the corporation's business entrusted to his care and, although, the particular act of such agent was unknown, unauthorized, and unapproved by the chief officers of the corporation, and was in violation of express instructions.

Some of these general rules of law are as follows: "Generally, a corporation is liable in the same way as a natural person for a tort committed by its servant or agent within the scope of his authority and course of employment, even though it did not authorize or ratify the act, or forbade it; . . . " 19 C. J. S., Corporations, Sec. 1260, p. 946; 13 Am. Jur., Corporations, Sec. 1118, p. 1042; Whiteaker

v. Chicago, R. I. & P. Ry. Co., 252 Mo. 438, 458, 160 S. W. 1009, l. c. 1014(8); Fensky v. Maryland Casualty Co., 264 Mo. 154, 174 S. W. 416, l. c. 417 (1); Haehl v. Wabash Ry. Co., 119 Mo. 325, 329, 24 S. W. 737, 741; Connell v. A. C. L. Haase & Sons Fish Co., 302 Mo. 48, 257 S. W. 760, l. c. 768(6), 773(19); Cousins v. Hannibal & St. Joseph R. Co., 66 Mo. 572, 576.

An agent's malice is imputable to the corporation, making the latter liable for malicious, willful, or criminal torts of its agents or employees within the scope of their employment. 19 C. J. S., Corporations, Sec. 1263, p. 948; 13 Am. Jur., Corporations, Sec. 119, p. 1045; State ex inf. Crow, Atty. Gen. v. Firemen's Fund Ins. Co., 152 Mo. 1, 38, 52 S. W. 595, l. c. 605, citing cases; Simmons v. Kroger Groc. & Baking Co., 340 Mo. 1118, 1124, 104 S. W. (2d) 357, 360; State ex rel. United Factories, Inc. v. Hostetter, 344 Mo. 386, 126 S. W. (2d) 1173, l. c. 1175(3).

A corporation is liable for a fraud perpetrated on a third person by its agent within the apparent scope of his authority or the course of his employment even where the wrongful acts are ultra vires or in fraud of the corporation itself, and despite the fact that the corporation did not authorize, concur in, or know of, the fraud. 19 C. J. S., Corporations, Sec. 1278, p. 955; 13 Am. Jur., Corporations, Sec. 1125, p. 1050; 14a C. J. 775, Sec. 2845; 3 C. J. S., Agency, Sec. 257, p. 190; 2 Am. Jur., Agency, Sec. 362, p. 281. See, also, National City Bank of St. Louis v. Carleton Dry Goods Co., 334 Mo. 339, 67 S. W. (2d) 69, 73; Laird v. Keithley (Mo. Sup.), 201 S. W. 1138, 1143; Brown v. Kansas City Southern R. Co., 187 Mo. App. 104, 173 S. W. 73; Darks v. Scudders-Gale Groc. Co., 146 Mo. App. 246, 130 S. W. 430, l. c. 437.

Fraudulent acts of an agent for which his principal may be held responsible to a third party include the bribery of the third party's representative without the knowledge or consent of the principal of the agent who did the bribing. Alger v. Anderson, 78 Fed. 729, 735, et seq.; Honaker v. Board of Education, 42 W. Va. 170, 175, et seq.

The fact that the agent may have committed a crime does not relieve the corporation from civil responsibility. The rule is stated in Mechem on Agency (2d Ed.) Sec. 1999, p. 1564, as follows:

"The principal's civil liability for his agent's criminal or penal act rests upon the same considerations, and is, in many aspects, of the same nature, as his liability for his agent's torts generally. The performance of an act as a crime, unless expressly directed, or immediately participated in by the principal, could rarely be deemed to be within the scope of the agent's authority, but inasmuch as most acts which are punished as crimes have also a side from which they may be regarded merely as torts, it may often happen that the same act, which may from one standpoint be regarded and punished as a crime, may, from another, be regarded as a mere private tort; and if from this standpoint the act would impose liability upon the principal

as an act done within the scope of the employment, the fact that it might from another standpoint be treated and punished as a crime would not affect the result."

The test of corporate responsibility for the acts of an agent in making political contributions was discussed in the recent case of Egan v. United States, 137 Fed. (2d) 369, 379, where the court said:

"The test of corporate responsibility for the acts of its officers and agents, whether such acts be criminal or tortious, is whether the agent or officer in doing the thing complained of was engaged in 'employing the corporate powers actually authorized' for the benefit of the corporation 'while acting within the scope of his employment in the business of the principal.' If the act was so done it will be imputed to the corporation whether covered by the agent or officer's instructions, whether contrary to his instructions, and whether lawful or unlawful. Such acts under such circumstances, are not ultra vires even though unlawful. There is no longer any distinction in essence between the civil and criminal liability of corporations, based upon the element of intent or wrongful purpose. Malfeasance of their agents is not ultra vires. . . . The court is not concerned with whether political contributions were authorized by a resolution of the board of directors or acquiesced in by a majority of the board. Our inquiry concerns only the powers of the corporation, the business it was authorized to carry on in the exercise of those powers, and whether the officers of the company in making political contributions were engaged in carrying on that business within the scope of their official duties."

The rule applied to corporations in this state in quo warranto cases in holding them responsible for the acts of their agents within the scope of their authority is somewhat similar to the rule applied in determining a corporation's tort liability, it is that "acts and omissions of the officers and agents of a corporation are imputable to the corporation in so far as the grounds for forfeiture of its charter are concerned." State ex inf. Otto, Atty. Gen. v. St. Louis College of Physicians & Surgeons, 317 Mo. 49, 295 S. W. 537, 542; State ex inf. Crow, Atty. Gen. v. Firemen's Fund Ins. Co., 152 Mo. 1, 37, 52 S. W. 595; State ex inf. Hadley, Atty. Gen. v. Delmar Jockey Club, 200 Mo. 34, 55, 98 S. W. 539; Fletcher Cyclopedia Corporations (Permanent Edition) Vol. 16, Chap. 65, Sec. 8040, p. 759; Angell & Ames on Corporations, 11th Ed. Sec. 310, p. 340; 19 C. J. S., Corporations, Sec. 1663, p. 1435; 13 Am. Jur., Corporations, Sec. 1304, p. 1168; 44 Am. Jur., Quo Warranto, Sec. 44, p. 119.

Angell & Ames on Corporations, supra, state the rule as follows:

"As natural persons are liable for the wrongful acts and neglects of their servants and agents, done in the course and within the scope of their employment, so are corporations, upon the same ground, in the same manner, and to the same extent. In its relations to the

1116

government, and when the acts or neglects of a corporation, in violation of its charter or of the general law, become the subject of public inquiry, with a view to the forfeiture of its charter, the willful acts and neglects of its officers are regarded as the acts and neglects of the corporation, and render the corporation liable to a judgment or decree of dissolution.''

The Firemen's Fund Insurance Company case, supra, was a proceeding in quo warranto to oust seventy-three foreign insurance companies for violation of the laws relating to ''Pools, Trusts and Conspiracies.'' The court said:

''And the conclusion is inevitable and irresistible that the Underwriters' Social Club of St. Joseph is a plain, palpable, but bungling, pool, trust, agreement, combination, confederation and understanding organized to evade the anti-trust laws of Missouri but wholly inefficient for such a purpose. The local agents did it and all knew it, and their knowledge is the knowledge of their companies, and their acts are the acts of their companies. (Nickell v. Phoenix Insurance Co. of Brooklyn, 144 Mo. 420.) For it could not be tolerated for a moment that an insurance company could hide under the skirts of its agents and violate the anti-trust laws of our State with impunity. These corporations can only act through agents and if their agents' acts or practices are in violation of their orders, they must suffer the consequences, for the law must be enforced whether the act violating it is done by one or another of the agents of the corporation. The company can and must control its agents, and must see, at its peril, that its agents do not violate the law while attending to the business of the company. This is the rule as to libels, assaults, malicious torts by agents of incorporated companies and there is greater reason for it being the true rule in cases involving the anti-trust laws.'' (152 Mo. 1, 37, 52 S. W. 595.)

The Delmar Jockey Club case, supra, was in quo warranto to oust a corporation because of nonuser and misuser of its franchises. The court said:

''The acts for which a forfeiture of defendant's charter is asked are acts done by the corporation through its officers, agents, employees and representatives in charge of its business, and not any act done by unauthorized persons. A corporation can act only through its agents and servants and it is responsible to the State for the acts of such agents and servants in the carrying on of the business of the corporation.'' (200 Mo. 34, 55, 92 S. W. 185, 98 S. W. 539.)

In applying this rule of responsibility, this court in quo warranto proceedings has forfeited the franchise of certain educational corporations on account of fraudulent misuse of powers in granting diplomas. State ex inf. Otto, Atty. Gen. v. St. Louis College of Physicians & Surgeons, supra, (317 Mo. 49, 295 S. W. 537, 542);

State ex inf. Otto v. Kansas City College of Medicine & Surgery, 315 Mo. 101, 285 S. W. 980, 983.

The mere fact that the chief officers of the respondents never knew of, authorized or ratified the particular acts complained of, towit, Street's bribery of O'Malley constitutes no defense in this proceeding in quo warranto. State ex inf. Crow, Atty. Gen. v. Firemen's Fund Ins. Co., supra, (152 Mo. 1, 37, 52 S. W. 595); State ex inf. Crow, Atty. Gen. v. Armour Packing Co., 173 Mo. 356, 381, 386, 73 S. W. 645.

As in tort cases, the mere fact that the acts complained of in quo warranto may further constitute a criminal offense is no bar to a charge of misuse and abuse of the corporations franchise. 44 Am. Jur., Quo Warranto, Sec. 19, p. 99; State ex inf. Crow, Atty. Gen. v. Firemen's Fund Ins. Co., supra, (152 Mo. 1, 37, 52 S. W. 595); State ex inf. Harvey, Cir. Atty. v. Mo. Athletic Club, 261 Mo. 576, 606, 170 S. W. 904; State. ex inf. Hadley, Atty. Gen. v. Delmar Jockey Club, supra, (200 Mo. 34, 51, 98 S. W. 539); State ex rel. Barrett, Atty. Gen. v. First National Bank, 297 Mo. 397, 249 S. W. 619, 624; State ex rel. Langer, Atty. Gen. v. Gamble-Robinson Fruit Co., 44 N. D. 376, 176 N. W. 103, 107.

In the prior opinion in this cause, State ex inf. McKittrick, Atty. Gen. v. America Ins. Co., 346 Mo. 269, 140 S. W. (2d) 36, 40, this court recognized that the same act of an agent might constitute a crime and be a violation of the implied contract of the corporation with the state. The court said:

"Conduct of officers and agents of a corporation, which is criminal under the laws of the State, is both a violation of the criminal law by the individual (and in some instances also by the corporation), for which there may be prosecution by criminal information or indictment and also a violation of the implied contract of the corporation with the State for which its charter or franchise may be forfeited in quo warranto proceedings."

Respondents are foreign corporations, but it is well settled that a foreign corporation abusing or misusing its privileges and franchises in the state, violating the law, or doing acts in contravention of the established policy of the state may be ousted in quo warranto. State ex inf. Crow, Atty. Gen. v. Armour Packing Co., supra, (173 Mo. 356, 73 S. W. 645); State ex rel. Barrett, Atty. Gen. v. First National Bank, supra, (297 Mo. 397, 249 S. W. 619); 23 Am. Jur., Foreign Corporations, Secs. 256 and 257, p. 227, et seq.; 20 C. J. S., Corporations, Sec. 1843(b), p. 63; State of Nebraska ex rel. Spillman, Atty. Gen. v. Bricton Mfg. Co., 113 Neb. 781, 205 N. W. 246, 41 A. L. R..992, 996; State v. American Sugar Refining Co., 138 La. 1005, 71 So. 137, 141.

The acts of Street in bribing O'Malley, done as they were by a duly authorized agent of the respondents in the transaction of the business intrusted to his care, were the acts of the respondent cor-

porations. His willfulness and knowledge of unlawfulness was the willfulness and knowledge of the respondents. The acts were done in pursuance of a conspiracy to cheat and defraud and were intended to accomplish respondents' purposes and further their interests. The acts constituted a violation of the very essence of the implied contracts of the respondent corporations with the state, in that the acts tended to corrupt the state official designated by law to supervise respondents' activities and to control rates of insurance in this state. The acts tended to inflict injury upon the public generally and were highly detrimental to the public interest. The bribery was directly connected with the conspiracy to cheat and defraud the policyholders of the respondents in this state and the State of Missouri. The acts complained of were a misuse and abuse of the corporate franchises granted to respondents and respondents must be ousted from the state or otherwise punished, unless the acts complained of are barred by the applicable statute of limitations.

(d) The Statute of Limitations.

Respondents in their brief state their position on this question as follows:

''That the three-year statute of limitations applies there can be no question. That it does apply is conceded by the relator, but the relator contends that the limitation did not begin to run until the payment of $10,000 made by Street to McCormack and by McCormack to Pendergast in October, 1936. This contention is unsound for several reasons because (1) there is no evidence of any conspiracy, agreement or understanding between respondents under which any payment was made by Street to Pendergast, (2) this $10,000 payment was made out of Street's personal funds and not out of any moneys furnished to Street by any of the respondents, and (3) no part of this $10,000 was ever paid to O'Malley and there is no evidence that O'Malley was ever to receive any part of this $10,000.''

We have heretofore in this opinion fully answered the first contention. It will be noted that we decided the evidence showed a conspiracy to bring about a settlement by bribery and fraud and that respondents, represented by Street, O'Malley in his capacity as Superintendent of Insurance, McCormack and Pendergast were parties thereto. Respondents, however, insist that even if it be assumed ''as charged in the information, that there was a conspiracy'', the payment of the $10,000 to Pendergast in October, 1936, was not made under the alleged conspiracy since the object of the conspiracy had been consummated and ended in March, 1936. The information was filed on May 29, 1939. Respondents in their brief quote the following from the case of State ex inf. Major, Atty. Gen. v. Arkansas Lumber Co., 260 Mo. 212, l.c. 292, 169 S. W. 145:

''Such limitation, however, does not have reference to the day of the making and entering into the illegal conspiracy, but to the date

of the last proven overt act under such conspiracy, regardless of the date at which the original illegal agreement was made (Ware v. United States, 154 Fed. 577; United States v. Brace, 149 Fed. 874).''

The same case was cited by relator as authority and we may state that the rule of law there announced is correct. To properly apply this rule to this case we must determine if there were any overt acts by the parties to the conspiracy in furtherance of the conspiracy after May, 1936.

We have heretofore outlined the manner in which the fraud and bribery were perpetrated. We have also fully stated what was accomplished by the compromise settlement made in pursuance of the conspiracy. Among the objects accomplished was the obtaining by respondents of the major portion of the impounded funds. That constituted a part of the illegal benefits respondents received through the fraud and bribery. We will review some of the evidence to demonstrate that a number of overt acts by the conspirators were committed after June, 1936, and within three years prior to the filing of the information.

We have reviewed McCormack's testimony to the effect that sometime in the fall of 1936, about October, O'Malley informed him that Pendergast was ill in a hospital, in need, and asked him if he would help by getting some more money. McCormack informed him he would see Street. McCormack went to Chicago and informed Street of what O'Malley had said. It must be remembered in connection with this evidence that a large portion of the money promised to be paid to Pendergast had not been paid. Street, so McCormack testified, said he would see what he could do. Later Street sent McCormack $10,000 through a bank at St. Louis. McCormack took this money and personally delivered it to Pendergast at a hospital in Kansas City, Missouri. McCormack was asked:

''Q. Did you ever ask Mr. Street if he paid the remainder of the money? A. No, because the case was never finally settled.''

The evidence disclosed that Pendergast never did collect all of the money Street promised to pay him.

We have heretofore mentioned that all of the checks of the respondents in this case making up the fund to be paid to Pendergast were made payable to Street, or Street as agent, except five which were made payable to Folonie, as agent. These five checks, dated in March, 1936, were presented to Folonie, by Street, for endorsement in November, 1936. Folonie testified he had never heard of the checks and that when Street presented them to him he was in Street's office on some business matter and Street got out the checks and said:

'' . . . that he had some fund for which he found he had no further use; that he was accounting back to the companies for, and that he wanted me to endorse those checks over to him, which I did in his office. Those checks I am informed and believe to have been some-

where between $13,000.00 and $14,000.00. Until March, 1939, I had no knowledge that he had had any sum in excess of that amount in his possession in 1936.''

Folonie further testified concerning his endorsement of the checks: ''My employer asked me to assign them over to him and I did. Q. Well, your employer — you mean the Chairman of the Committee? A. Yes.'' These five checks were cashed by Street about November 18, 1936. One of the checks was issued by the Bankers and Shippers Insurance Company of New York in the sum of $2,060.97; another by the Pacific Fire Insurance Co. for $1602.17; another by the Hanover Fire Insurance Co. for $4116.48; another by the Patriotic Insurance Company of America for $249.31; another by the United States Branch of the Sun Insurance Office of London Limited for $3591.06, making a total of $11,619.99. There was a sixth check made payable to Folonie, but the company issuing that check is not now a respondent and we omitted it in our discussion.

Another transaction occurred in November, as revealed by the evidence of Robert Roy Clark, who testified that he attended the meeting at Hartford on May 3, 1935, and that his company, the Caledonian Insurance Company, gave $2,000 to the fund of $100,000 which Street was collecting at that time. The $2,000 was for more than 5 per cent of the company's impounded funds. On November 19, 1936, the company wrote Street for an adjustment. On November 23, 1936, Street wrote the company enclosing a check for the $2,000 that had been advanced and also a check for $1,090.12, being 11 per cent of the company's impounded funds and being a portion of the 30 per cent held by Street and Folonie as trustees. In this letter Street requested the company to send him a ▇▇▇ check for $495.50, payable to his order, representing 5 per cent of the impounded funds, and explained that all other companies had made a like contribution. The company sent the check as requested by Street and this check was cashed November 30, 1936. It will, therefore, appear that Street actually collected from the respondents the sum of $12,115.49 in the month of November, 1936. It appears in that month Street had not finished distributing the 11 per cent to which the companies were entitled under the compromise agreement. It also clearly appears that the same individuals, who originally instigated this conspiracy, took part in these transactions occurring in October and November, 1936. O'Malley, as he had done before, notified McCormack that Pendergast needed money referring, of course, to the fact that they had not finished paying what they had promised. McCormack, the go-between between O'Malley and Street, delivered that information to Street whereupon Street, some time later, sent the money by McCormack to Pendergast just as had been done previously. These we deem to be overt acts in furtherance of the conspiracy. The collection by Street of the money in excess of $12,000 from respondents was a continuation of the collection of the fund to be

paid to Pendergast. The $10,000 was actually paid to Pendergast, the man designated by O'Malley to deal with Street.

The evidence further reveals that the trustees in December, 1937, had in their possession 7 per cent of the impounded funds, a part of the 30 per cent originally given to them for the purpose of paying all of the expenses. The expenses had all been paid, but Street was reluctant to distribute this balance to the respondents, insisting that the sum might be needed. Folonie, the other trustee, insisted upon a distribution. Folonie finally called on Mr. Henne, a member of the Subscribers Actuarial Committee, for advice on the matter and he too insisted on a distribution. Then Street informed them he had expended large sums of money during the years the litigation was pending and wanted to be reimbursed. Folonie objected unless Street could show the items of expense. Street was insisting on a lump sum. The controversy ended by a payment of 5 per cent to the respondents. Note Folonie's evidence on this point:

"By the way, I may say that the committee by unanimous action ordered a distribution of 5 per cent instead of the seven more or less we had in our hands, leaving the other one and a half or two per cent as a sort of a sop to Mr. Street because he objected so violently to distributing the money before the committee and assailed several members of the committee in that talk, that they ordered a distribution of 5 percent and gave us an order in writing. We never paid anything out of this trust fund without a written direction from the committee, all of which I have in this book here."

The inference that may legitimately be drawn from that evidence is that Street was attempting to get a portion of this fund held by the trustees for the purpose of fulfilling his promise to Pendergast. It will be remembered that all of the money Street collected and paid to Pendergast was indirectly out of this trust fund. Again, the payment of the 5 per cent by the trustees in December, 1937, was out of the funds that the respondents had illegally obtained through the fraudulent settlement. So it may be safely stated that the object of the conspiracy had not been completely fulfilled in March, 1936. In fact, respondents in effect so concede, when in argument on another issue they say: "The whole matter had not been closed up at the time of Street's death" (February, 1938), because " . . . both the custodian and the trustees still had in their hands moneys belonging to the companies."

As to the third point, that no part of this $10,000 was ever paid to O'Malley, or that he was to receive any part thereof, is entirely immaterial. O'Malley asked McCormack to get the money and to have it paid to Pendergast. That is what was done. Pendergast was the man specifically designated by O'Malley to be the recipient of the money. The payment of the $10,000 was in furtherance of the original conspiracy agreement. These overt acts on the part of the four

conspirators, occurring in November, 1936, were within the limitation period. We are of the opinion that they come squarely within the rule as contended for by the respondents, and as quoted above "the date of the last proven overt act under such conspiracy, regardless of the date at which the original illegal agreement was made," controls in such cases. Such respondents and relator agree that this is the correct rule of law, and since we also agree, it will serve no useful purpose to cite authority in support thereof.

### Part IV.

### Employment of Boyle G. Clark.

Relator in his brief stated this charge as follows:

"Relator asserts that the employment of an attorney by Respondents who was then an employee of the Insurance Department of this State, and known by Respondents to be so employed, is an abuse and misuser of their respective corporate franchises in causing the Superintendent of Insurance of this State to violate the terms of Section 5788, R.S. Mo. 1939."

The section referred to by relator, in so far as applicable to this charge, reads as follows: The superintendent "shall not employ any person in any capacity who is an officer, agent or employee of any insurance company or association." To understand the situation, at the time Clark was employed by the Missouri Inspection Bureau, it will be necessary to briefly relate the facts. This court in 1935, in the case of State ex inf. McKittrick, Atty. Gen. v. American Colony Ins. Co., 336 Mo. 406, 80 S.W. (2d) 876, decided that the companies who had joined in a suit in the Circuit Court of Cole County to review the order of the Superintendent of Insurance refusing to grant the 16 2/3 per cent increase, were illegally collecting the increase while the suit for review was pending. On December 9, 1937, this court's decision in American Constitution Fire Assur. Co. et al. v. O'Malley, Supt. of Ins., 342 Mo. 139, 113 S.W. (2d) 795, ended the review proceedings upon the merits by affirming the judgment of the circuit court dismissing the petition. This court further directed the circuit court to return the impounded funds from the registry of the court to the Superintendent of Insurance for distribution to the policyholders. Further litigation followed involving the question of whether the Circuit Court of Cole County had authority to supervise the distribution and to make allowances of claims against the fund. See State ex rel. Robertson v. Sevier, 342 Mo. 346, 115 S.W. (2d) 810. That decision was rendered April 21, 1938. It will be noted that the controversy was between the Superintendent of Insurance and the Circuit Judge of Cole County. This court held that the circuit court had no jurisdiction to supervise the distribution. Later another suit, which involved the question of supervision of the distribution, was filed in the Circuit Court of Boone County. The superintendent had

filed a suit in that court asking its aid on certain legal questions. This court issued a writ of prohibition restraining the Boone County Circuit Court from acting because it lacked jurisdiction. That decision was made December 20, 1938. See State ex rel. Carwood Realty Co. et al. v. Dinwiddie, 343 Mo. 592, 122 S.W. (2d) 912. It will be noted that that controversy was merely over the question of whether the Boone County Circuit Court had jurisdiction to supervise the distribution. The insurance companies and the Missouri Inspection Bureau were not directly interested in either suit. The latter suit, that is the Boone County case, was filed by Boyle Clark as attorney.

After this court, on December 9, 1937, ordered the impounded funds to be distributed, a number of questions arose, as for example, the expense of distribution, the costs incurred in the case and also whether the insurance companies were liable for interest on the impounded funds. Attorneys representing the insurance companies, the Insurance Superintendent and the attorneys representing the state held a number of conferences. The Attorney General and the Governor were present at a number of these. An agreement was finally reached. The substance of what the Insurance Department agreed to do was stated by relator during his examination of former Governor Stark who was a witness in this proceeding. The statement reads as follows:

"Q. The result of it is that the superintendent of insurance agrees to withdraw and dismiss the motion heretofore filed in the Circuit Court of Cole County, seeking to charge the companies with interest and the replenishment of the impounded funds and to do any and all things which may be necessary to bring about the withdrawal and dismissal of certain motions, and in the same capacity the superintendent of insurance covenants and agrees that he will bring no further action or proceeding of any nature which has as its object the charging of the companies in the American Constitution Company case with damages, expense, interest, or the replenishment of the impounded fund. That is the gist of it."

In the contract the companies agreed as follows:

"The insurance companies in said cause agree that they will not proceed further with said litigation, will not apply to the Supreme Court of the United States for a writ of certiorari and will not attempt to have the decision of the Supreme Court of Missouri reviewed in any way by the Supreme Court of the United States; they will not institute a separate action or actions in the Federal Court or in any other court to review or set aside the decision of the Supreme Court of Missouri but now recognize the finality and validity of the rate order of May 28, 1930 disallowing the filing of December 30, 1929, which was made effective June 1, 1930, and which was the source of the impounding of funds in the above mentioned cause, and recognize

the right of the Insurance Department of the State of Missouri to pass upon and regulate the rates.

"The companies also hereby relinquish any and all right, title or interest which they may have in the funds impounded in said cause and consent to distribution thereof by the Superintendent of Insurance of the State of Missouri."

The record indicates that Mr. Clark was present at a number of the conferences, preliminary to the above agreement, for the purpose of advising the Governor and also as representing the Insurance Department in the absence, due to illness, of Judge Henson who was at that time representing the Insurance Department. It is in evidence that Mr. Clark informed Mr. Henne, who was present as a representative of the insurance companies, that he, Clark, was not being paid for his services and that he was present merely to advise the Governor and as representing the Insurance Department for Judge Henson. After the agreement above mentioned was signed, March 24, 1938, Paul Terry of the Missouri Inspection Bureau and Mr. Henne, Chairman of the Subscribers Actuarial Committee, approached Mr. Clark with reference to engaging him as an attorney for the Missouri Inspection Bureau. An agreement was reached on April 25, 1938, and Clark was to be paid $6,000 per year as a retainer for general legal work for the Inspection Bureau. The first quarterly payment of $1500 was paid on April 30, 1938, employment to begin as of April 1. Mr. Henne testified that prior to the agreement he asked Clark if he was free to accept employment. Note Mr. Henne's testimony as to this point:

"Mr. Boyle Clark stated that he was acting for the State Department without compensation; he was representing the state and not the companies. After that we had several conferences in Jefferson City and agreement was finally drawn up and signed by the Governor, by the Insurance Commissioner, by the Attorney General, and by myself and Mr. Walter Eckert as representing the companies, and the matter was disposed of and settled. And it was after that all was out of the way Mr. Clark was employed, as I understand it, by Mr. Terry, and in my discussion with him I asked him particularly whether there was any connection that he had or any obligation that he had with state authorities that would in any manner preclude his employment by Mr. Terry, and he said, 'No'."

When the question of whether the Cole County Circuit Court and the Boone County Circuit Court had jurisdiction over the distribution of the impounded funds arose, Clark was consulted by the Insurance Department and he filed the suit in the Boone County Circuit Court on behalf of the superintendent. The record discloses that he was not paid for his services. While the suit was pending in the Circuit Court of Boone County, and on June 9, 1938, Clark

wrote a letter to Paul Terry of the Missouri Inspection Bureau. We quote the following therefrom:

"When on April 25, 1938, you and Mr. Henne spoke to me in Jefferson City about representing the companies connected with the Missouri Inspection Bureau and I accepted your proposition for such representation, I was free to accept any employment that I saw fit. After that time Superintendent of Insurance George Robertson and Governor Stark requested me to assist departmental counsel in preparing a petition for directions to be filed on behalf of the Superintendent of Insurance in Boone County to settle questions with reference to the distribution of the 16 2/3% fund collected in the State case. I knew at that time that the Attorney General, the Superintendent of Insurance and the Governor had signed an agreement dated March 24, 1938, by which the insurance companies had released all right to the fund and agreed to litigate no further, and the State had released all the companies involved in the State Court 16 2/3% litigation from any expenses or damages in connection with the fund. . . . Consequently when I agree to assist the departmental counsel in filing the suit for directions, I did not apprehend that there would be any contention that your companies were in anywise interested in that suit. They were not parties to the proposed suit and are not now parties to the suit which was filed in Boone County. I have now learned for the first time that it is possible that some contention will be made that all or some insurance companies doing business in the State should be assessed to pay the cost of distributing this fund. I suppose that they would necessarily include your companies despite the releases which they hold.

"Since this situation has developed I have concluded, as I told you yesterday, that I should relinquish my retainer in order to avoid the representation of any possible conflicting interests, however remote. Although I am being paid nothing for my services to Governor Stark and Mr. Robertson in the Boone County suit, I feel that I must continue to assist counsel for the department, at least until the question of jurisdiction of the Circuit Court of Boone County is determined one way or another."

The statements made by Mr. Clark in his letter above quoted are supported by the record. At the time Clark was employed by the Inspection Bureau the cases in the federal court had been settled, and the motion to set aside the decree entered pursuant to the settlement was not filed until May, 1939. We think it obvious that the Missouri Inspection Bureau violated no law when it employed Clark to represent it as general counsel. The rate litigation was out of the way. There were no lawsuits pending, at the time the Inspction Bureau contracted with Clark, wherein Clark was employed by the Insurance Department. Since Clark had advised the Insurance De-

partment in the settlement of the distribution of the funds, he was later called upon to advise the department with reference to the question of whether the Circuit Court of Boone County had jurisdiction to supervise the distribution, or rather, whether that court upon the request of the superintendent could advise the department as to legal questions arising during distribution. In May Clark filed the suit in the Boone County Circuit Court, at the superintendent's request, without being paid for his services. He thereafter, on June 9, 1938, as above indicated, severed his connections with the Inspection Bureau and returned the fee he had received.

In the circumstances we hold that the Inspection Bureau violated no law when it employed Clark. The fact that the insurance companies, through the Inspection Bureau, on April 11, 1938, and on August 17, 1938, paid Clark for expenses incurred in attending conferences, on behalf of the Insurance Department and the Governor, in reaching the settlement of March 24, 1938, is not of much significance. The insurance companies paid all of the costs incurred in the review suit. Clark's expenses ▓▓ were necessarily incurred in settling that controversy. The point must be decided against relator.

## Part V.

### Penalty.

▓▓ Since we have found that the respondents abused and misused their separate corporate franchises by bribery and fraud in obtaining the settlement of the insurance rate litigation and that they are responsible therefor to the state in this proceeding, all as hereinbefore fully set forth, we must now determine the penalty to be imposed. The question is extremely difficult. Many factors must be considered which may mitigate or aggravate the penalty. The. nature of the offense and the purposes intended to be accomplished by the bribery and fraud are important factors. Another is the knowledge and participation, if any, of respondents' chief officers. On the issue of respondents' liability to the state, Street's acts, willfulness and knowledge of unlawfulness were imputed to respondents, but now that that issue has been decided, we shall consider the knowledge, actual or implied, if any, of respondents' executive officers on the issue of a proper penalty.

We have seen that the respondents have, through all of this proceeding, vehemently argued that the officers of the several companies had no knowledge of or reason to suspect Street's ultimate purpose in collecting the money which was used in bringing about the fraudulent settlement. We cannot accept this view, because the evidence justifies the conclusion, and convinces us, that some executive officers of each of the companies had knowledge of facts which would have led any prudent person schooled in business affairs, as these officers were, to conclude that Street intended to use the fund fraudulently

or unlawfully. Some of the circumstances supporting that conclusion have been stated.

Previous to the time Street approached the officials of the companies at the New York and Hartford meetings, on May 2 and 3, 1935, he had laid his plans for a settlement. He had seen Pendergast at O'Malley's suggestion and had agreed to pay Pendergast a large sum of money. Street informed the groups at New York and Hartford that he thought the rate litigation could be settled and that the decision in the cases would in all probability go against the companies, yet he informed them that he thought he could settle on a basis of 10 .per cent to the policyholders and the balance to the companies after the payment of expenses. He said that Folonie, the leading counsel in the rate cases, had through the years of the rate litigation rendered himself persona non grata in Missouri; that a settlement could be effected by *one man* better than by a committee; that he, Street, could better settle the cases than anyone else; that, if he acted, he had to have money and would have to have an *initial fund of* $100,000, *in cash,* over which he would have to have *exclusive control;* and that this sum would have to be raised *immediately* and perhaps some more later on. Although the terms of the proposed settlement were outlined, a large sum of money was requested. One witness testified that Street made mention of a powerful person in Missouri. Another said Street indicated that 10 per cent of the impounded funds would be required for expenses. Another witness quoted Street as saying the cases had been won but he could settle them if the companies wanted him to. In any event, the money was to be used to bring about the settlement. When Street was asked how these payments should be entered upon the books of the companies he said it would be temporarily entered as legal expense or in a suspense account. He further stated he needed legal counsel, but not Folonie or other attorneys then representing the companies. When asked what he was going to do with the money he answered: "Do you trust me?" Street also made the assertion that if a settlement were not accomplished the money would be returned. Street insisted that he have *exclusive control* of the fund to compromise the case because it was always difficult to get a committee together and he then added: "I cannot compromise a case in a town meeting."

The group of companies represented at the New York and Hartford meetings advanced $100,500 for what they now say they thought was for attorneys' fees. It must be remembered that all through the years of this litigation all of the expense, including attorneys' fees, had been paid through assessments collected by the Missouri Inspection Bureau. That was the established practice. No company had ever been required to make advancements for attorneys' fees and we cannot believe that these executives thought it was necessary for large insurance companies to pay attorneys in advance to obtain

the benefit of their services, or that the proposed fund was to be used for such purposes. Shortly after the New York and Hartford meetings, in fact during the same month, the compromise was effected. All of the respondents were notified thereof. In March, 1936, shortly after the compromise was approved by the federal court at Kansas City, Missouri, all of the respondents were given the details of the settlement. In this notice the respondents were specifically told that 30 per cent of the impounded funds was placed in the hands of Folonie and Street for the purpose of paying all of the expense of the litigation. It also appears from the settlement agreement that Folonie was the only attorney for respondents who signed the agreement and nowhere does it appear that a new attorney was handling the case. The companies represented at the New York and Hartford meetings, who donated $100,000, as they now say, to hire additional counsel, had knowledge that Folonie in fact did act as their attorney at the time the settlement was made. Thereafter, these and other companies paid further sums to make up a total fund of approximately $450,000 that Street collected to pay someone in connection with the settlement. It is immaterial that the agreement for a settlement had been signed before the payments were made, so long as respondents were actively participating in obtaining the benefits of the bribery and fraud, towit, the return of impounded funds and the establishment of new rates of insurance; and that they contributed to the bribe fund under circumstances that should have put them on inquiry. It was well known that the impounded funds had reached a sum approaching $9,000,000 and that 5 per cent of this total was a very large sum.

We have heretofore reviewed the method of collecting 5 per cent of the impounded funds from each of the respondents after the decree was entered in the federal court. We have also outlined how Street, Haid and Erskine delivered in person most of the 11 per cent checks and at the same time collected from respondents the 5 per cent checks as contributions to Street's fund. The 11 per cent checks were paid out of the 30 per cent trust fund held by Street and Folonie, as trustees, and the respondents knew that that fund was far more than sufficient to pay all expenses. Delivering the checks in person was admitted to have been very unusual. More unusual, however, was the collection of money direct from respondents to pay expenses of litigation. In doing so the officers of some of the large companies passed over the heads of their own district officers by whom such matters were usually handled. When the respondents paid the 5 per cent, they had in their possession the knowledge above outlined. Each of the respondents had been notified by the Subscribers Actuarial Committee that Folonie and Street would pay out of the trust fund all of the court costs, attorneys' fees, in fact "any debts incurred by or under the direction of this committee." A number of the companies were called over the telephone and instructed to send the 5 per cent

checks. Others were contacted by letter. In these letters no explanation was made with reference to the use of the fund of the 5 per cent payment. Some of them were informed that an explanation would be made in person either by Street or Haid. One witness testified that, when Street delivered in person the 11 per cent check and collected the 5 per cent check, he asked Street what use would be made of the fund and Street answered, "I cannot tell you that now." Some companies asked for an explanation and received by letters various statements which were indeed peculiar. For example, one letter from Street informed a company that the money was to be used for an item which "cannot be paid out of the trustees' account . . . no bribery, but *legitimate expenses which we cannot put in our report to the court.*" (Italics Ours.) It is difficult to conceive any legitimate expense in connection with the rate litigation that could not have been put in the report to the court. Neither do we see why an explanation of the expenditure and use of the 5 per cent fund, if legitimate, could not be made in writing. Why should it have to be made in person? We cannot here relate the detailed facts and circumstances within the knowledge of each officer of each individual company. Some facts were known to all the companies and some were known only to particular companies. All, however, had knowledge of sufficient facts, independent of Street's knowledge, to put them on inquiry. From the facts in evidence it appears that respondents must have known that the sum being raised by the 5 per cent collections was not for attorneys' fees, nor for any legitimate expense. It seems apparent to us that any prudent man's suspicion would have been aroused when asked to pay money under such circumstances. With all these suspicious circumstances there was not, so far as this record reveals, any real attempt made by any of the respondents to determine how Street was using the money. No inquiry was made by any respondent, of Folonie, the other trustee, about this fund. The conclusions we have reached on the issue of implied knowledge are in harmony with the opinion rendered in the federal court wherein the same question was considered. See opinion of Judge Stone in the case of American Ins. Co. v. Lucas, 38 Fed. Supp. 896, l. c. 924. The facts and circumstances mentioned by Judge Stone, as well as other facts, clearly appear from the record in this case.

While the executives attending the meetings in New York and Hartford may have had a little more information than the executives of some of the other companies, we think the record sufficiently shows that someone in authority, other than Street, in each and every one of the respondent companies had sufficient knowledge of facts and circumstances to have put a person of ordinary prudence and diligence on inquiry and, if such inquiry had been pursued with proper diligence, the bribery and fraud perpetrated, or about to be perpetrated by Street, would have been discovered. Assuming that none of

1130

the executive officers of respondent companies had any actual knowledge of the bribery at the time they authorized the payments to Street, yet, if they had knowledge of facts and circumstances which would have put a person of ordinary prudence on inquiry and, thereafter, exhibited a callous indifference concerning the manner in which their agent was handling their funds to obtain results satisfactory to them, such facts may be taken into consideration in determining a proper penalty.

As stated, respondents in their briefs say that they had no knowledge of any wrongful doings on the part of Street until the bribery was brought to light in the public press; that "upon learning of Street's wrongful acts, they promptly and voluntarily repudiated his wrongful acts and restored everything which they had, directly or indirectly, received." We have ruled that respondents, independent of Street's agency, were in possession of knowledge which would have led a person of ordinary prudence in their position to suspect something was being done inconsistent with the law. As to restoring everything respondents received through the settlement that is true in so far as the impounded funds are concerned. In this connection we have carefully read and considered the opinion by Judge Stone in the case of American Ins. Co. v. Lucas, supra, 38 Fed. Supp. 896, 899, referred to by respondents. See, also, American Ins. Co. v. Lucas, (same case), 38 Fed. Supp. 926, 936. However, it will be remembered that the compromise also affected the rates to be charged. In the agreement it was provided that:

"After approval of courts is had the companies, through Missouri Inspection Bureau and after filing of printed rates, will file basis schedules on various classes, as already submitted to the Superintendent, which when applied and in connection with other basis schedules as printed will produce a rate level not to exceed 97.6 per cent of printed rates."

The Missouri Inspection Bureau did file a schedule of rates which gave a rate level of 88.87 per cent, which rates were put in force November 11, 1935. In this connection ▋ we are also giving due consideration to the evidence of Mr. Paul Terry of the Missouri Inspection Bureau to the effect that long before the litigation was settled the bureau had been compiling figures and preparing to file a new schedule of rates based upon the previous five years aggregate experience; that the rate of 88.87 per cent was based upon that experience and not upon the compromise agreement. The Missouri Inspection Bureau also filed various schedules giving a broader coverage to policyholders. After November, 1935, the Superintendent of Insurance made no order reducing rates until October, 1943, when Scheuffler, the then Superintendent of Insurance, ordered a reduction amounting to about $600,000 per year, stating in the order that he

had found that the aggregate experience of the previous five years disclosed profits in excess of what was reasonable by that amount.

It must be observed that the decision by this court in American Constitution Fire Assur. Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795 (December 9, 1937), did not affect the rates as approved by the Superintendent of Insurance in November, 1935. Neither did the action of the federal court in ordering restitution of impounded funds affect those rates. The companies, therefore, retained what benefit they derived through the fraudulent settlement with reference to insurance rates. That respondents viewed the agreement as a benefit is revealed by a report made to a meeting of the insurance executives in April, 1938, by the chairman of the Subscribers Actuarial Committee, which report read in part as follows:

"In considering our troubles in Missouri we frequently lose sight of the fact that our real rate troubles ceased when the agreement was signed in 1935 and the new filings made by the bureau became effective November 1, 1935."

In assessing a punishment we shall take into consideration the fact that the impounded funds were restored and paid to the policyholders. We shall also take into consideration the fact that this litigation had been in the courts for many years, and that it was becoming particularly irksome to many insurance executives. In fact we shall view the whole case and all the facts and circumstances surrounding it, and give due consideration to mitigating circumstances as well as those militating against respondents.

In the information, relator asked that respondents be ousted from doing business in this state or that they be otherwise punished. On oral argument before this court, relator did not ask for an ouster, but that a fine of $100,000 be assessed against each respondent. We are of the opinion that a judgment of absolute ouster is not necessary and the imposition of a fine will, under the circumstances, be adequate punishment. The authority to assess a fine is well established. Standard Oil Co. v. Missouri ex inf. Hadley, 224 U. S. 270, 32 Sup. Ct. 406, 56 L. Ed. 760; State ex inf. McKittrick, Atty. Gen. v. American Ins. Co., supra, (140 S. W. (2d) 36, 40).

We have given much thought to the method of determining the amount of the fine, whether all respondents should suffer an equal penalty, whether we should attempt to segregate respondents in groups according to our opinion of the culpability of each group, or whether to base the amount of the fine on the amount of business transacted in Missouri as revealed by the impounded funds. We have come to the conclusion that to attempt to distinguish the degree of culpability of one respondent in comparison with another would be an extremely difficult task. In view of the enormous record in this case it is certain that injustices would result. We will concede that

the method we shall follow in assessing a penalty is not entirely perfect.

As we have seen, the 16 2/3 per cent increase in insurance premiums was impounded under the orders of the federal court. The impounded funds of each respondent, therefore, represent a certain per cent of the total gross premiums collected by such respondent from its policyholders during the period from the date of institution of the cases in the federal court to about May 1, 1935. The impounded funds of the respective companies also evidence the comparative business done in this state by the several respondents during the particular period. Subject to a minimum, the amount of the individual fines assessed will be generally based upon the amount the particular respondent had in impounded funds on May 1, 1935. The result will be that each respondent will be fined on the basis of its apparent interest in the result of the insurance rate litigation and generally in proportion to the amount each respondent contributed to the fund used in bringing about the fraudulent settlement. In fixing the amount of the fines we may keep in mind that the usual purpose in assessing a fine is at least twofold: First, to serve as a punishment for the offense committed; second, to act as a deterrent to others who may be inclined or tempted to commit like offenses.

In view of the whole record, considering the case from every angle, we are of the opinion that a fine of not less than $10,000 should be assessed against each and every respondent. Such a minimum fine shall be assessed against those companies making contributions of less than $2500 to the fund used by Street in bringing about the fraudulent settlement. Except as hereinafter stated, the companies making contributions in excess of $2500 shall pay an amount equal to approximately four times the 5 per cent contribution made to the fraudulent expense fund.

Relator in his brief divided the respondent companies into fifty groups. In each case, where a group consists of more than one company, such group is controlled by substantially the same officers. In assessing fines against respondents, we shall list them according to groups and we shall indicate the amount of the fine assessed against each company separately.

It is, therefore, ordered, adjudged and decreed by this court that the respondents and each of them have misused and abused their separate corporate franchises to do business in this state in that each of them, through a duly authorized agent, sought to obtain and obtained a fraudulent settlement of the insurance rate litigation by fraud and the bribing of the state official charged with the duty of supervising insurance rates in this state. It is further ordered and adjudged that the respondents and each of them shall pay as a penalty for such misuse and abuse of their corporate franchises the fine indicated below, such fine to be paid to the Clerk of this Court

within sixty days after the adoption of this opinion, and that respondents pay the costs of this proceeding. The clerk of this court shall pay the amount of the fines collected into the treasury of the state. Upon default or failure to pay such fine on or before the date set, the State of Missouri shall have execution therefor to be levied by the Marshal of this Court and enforced according to the laws of this state in such cases made and provided, this court to retain jurisdiction of the case until the total fines and the costs of this proceeding be paid by the respondents.

The fine assessed against each respondent is as follows:

| Group | Name of Company | Amount of Fine |
|---|---|---|
| 1 | American Ins. Co. | $36,000 |
| 1 | Columbia Fire Ins. Co. | 10,000 |
| 2 | Aetna Ins. Co. | 43,000 |
| 2 | World Fire & Marine Ins. Co. | 10,000 |
| 3 | Agricultural Ins. Co. | 10,000 |
| 4 | Atlas Assur. Co., Ltd. | 10,000 |
| 5 | Automobile Ins. Co. | 21,000 |
| 5 | Standard Fire Ins. Co. of Connecticut | 10,000 |
| 6 | Bankers & Shippers Ins. Co. | 10,000 |
| 6 | Pacific Fire Ins. Co. | 10,000 |
| 7 | Boston Ins. Co. | 21,000 |
| 7 | Old Colony Ins. Co. | 10,000 |
| 8 | Caledonian Ins. Co. | 10,000 |
| 9 | Camden Fire Ins. Ass'n | 10,000 |
| 10 | Commercial Union Assur. Co., Ltd. | 14,000 |
| 10 | Palatine Ins. Co., Ltd. | 10,000 |
| 10 | Union Assur. Society Ltd. | 10,000 |
| 10 | Commercial Union Fire Ins. Co. | 10,000 |
| 10 | American Central Ins. Co. | 30,000 |
| 10 | California Ins. Co. | 10,000 |
| 11 | Continental Ins. Co. | 54,000 |
| 11 | Fidelity Phoenix Fire Ins. Co. | 68,000 |
| 11 | First American Fire Ins. Co. | 10,000 |
| 11 | American Eagle Fire Ins. Co. | 10,000 |
| 11 | Niagara Fire Ins. Co. | 10,000 |
| 12 | Dubuque Fire & Marine Ins. Co. | 12,000 |
| 12 | National Reserve Ins. Co. | 10,000 |
| 13 | Eagle, Star & British Dominions Ins. Co. | 10,000 |
| 14 | Fire Ass'n. of Philadelphia | 15,000 |
| 14 | Lumberman's Ins. Co. | 10,000 |
| 14 | Reliance Ins. Co. of Philadelphia | 10,000 |
| 15 | Fireman's Fund Ins. Co. | 23,000 |
| 15 | Home Fire & Marine Ins. Co. | 10,000 |

1134

| Group | Name of Company | Amount of Fine |
|---|---|---|
| 16 | Firemen's Ins. Co. | $25,000 |
| 16 | Girard Fire & Marine Ins. Co. | 10,000 |
| 16 | National Ben Franklin Fire Ins. Co. | 10,000 |
| 16 | Concordia Fire Ins. Co. of Milwaukee | 12,000 |
| 16 | Milwaukee Mechanics Ins. Co. | 14,000 |
| 17 | Glens Falls Ins. Co. | 10,000 |
| 17 | Commerce Ins. Co. | 10,000 |
| 18 | Globe & Rutgers Fire Ins. Co. | 11,000 |
| 19 | Great American Ins. Co. | 44,000 |
| 19 | American Alliance Ins. Co. | 16,000 |
| 19 | County Fire Ins. Co. of Philadelphia | 10,000 |
| 19 | Massachusetts Fire & Marine Ins. Co. | 10,000 |
| 20 | The Hanover Fire Ins. Co. | 16,000 |
| 21 | Hartford Fire Ins. Co. | 94,000 |
| 21 | Citizens Ins. Co. | 11,000 |
| 21 | New York Underwriters Ins. Co. | 30,000 |
| 21 | Northwestern Fire & Marine Ins. Co. | 10,000 |
| 21 | Twin City Fire Ins. Co. | 10,000 |
| 22 | The Home Ins. Co. | 132,000 |
| 22 | Franklin Fire Ins. Co. of Philadelphia | 32,000 |
| 22 | National Liberty Ins. Co. of America | 17,000 |
| 22 | City of New York Ins. Co. | 11,000 |
| 23 | Insurance Co. of North America | 36,000 |
| 23 | The Alliance Ins. Co. of Philadelphia | 10,000 |
| 23 | National Security Fire Ins. Co. | 10,000 |
| 23 | Philadelphia Fire & Marine Ins. Co. | 10,000 |
| 24 | The Ins. Co. of the State of Pennsylvania | 10,000 |
| 25 | The London Assur. Corp. | 12,000 |
| 25 | Manhattan Fire & Marine Ins. Co. | 10,000 |
| 25 | The Union Fire Ins. Co. | 10,000 |
| 26 | London & Lancashire Ins. Co. Ltd. | 15,000 |
| 26 | The Law, Union & Rock Ins. Co. Ltd. | 10,000 |
| 26 | Orient Ins. Co. | 14,000 |
| 26 | Safeguard Ins. Co. | 10,000 |
| 27 | Merchants Fire Assur. Corp. of New York | 12,000 |
| 28 | The Merchants Fire Ins. Co. | 10,000 |
| 29 | National Fire Ins. Co. of Hartford | 61,000 |
| 29 | Franklin National Ins. Co. | 10,000 |
| 29 | Mechanics & Traders Ins. Co. | 10,000 |
| 29 | Transcontinental Ins. Co. | 10,000 |
| 30 | National Union Fire Ins. Co. | 16,000 |
| 31 | New Hampshire Fire Ins. Co. | 15,000 |
| 31 | Granite State Fire Ins. Co. | 10,000 |
| 32 | Northern Assur. Co. Ltd. | 17,000 |

| Group | Name of Company | Amount of Fine |
|-------|-----------------|----------------|
| 32 | London & Scottish Assur. Corp. Ltd. ........... | $10,000 |
| 33 | Northern Ins. Co. of New York ................ | 14,000 |
| 34 | Norwich Union Fire Ins. Society Ltd. .......... | 10,000 |
| 34 | The Eagle Fire Co. of New York .............. | 10,000 |
| 35 | Phoenix Assur. Co. Ltd. of London ............ | 15,000 |
| 35 | Columbia Ins. Co. of New Jersey ............. | 10,000 |
| 35 | Imperial Assur. Co. .......................... | 10,000 |
| 35 | United Firemen's Ins. Co. of Philadelphia ...... | 10,000 |
| 36 | The Potomac Ins. Co. of the Dist. of Columbia .. | 10,000 |
| 37 | Providence Washington Ins. Co. ............... | 10,000 |
| 38 | The Phoenix Ins. Co. ........................ | 24,000 |
| 38 | Connecticut Fire Ins. Co. .................... | 20,000 |
| 38 | Equitable Fire & Marine Ins. Co. .............. | 10,000 |
| 38 | Central States Fire Ins. Co. .................. | 10,000 |
| 39 | Rhode Island Ins. Co. ........................ | 12,000 |
| 39 | Merchants Ins. Co. of Providence .............. | 10,000 |
| 40 | Royal Exchange Assur. ....................... | 22,000 |
| 40 | Provident Fire Ins. Co. ...................... | 10,000 |
| 41 | Royal Ins. Co. Ltd. ......................... | 20,000 |
| 41 | Liverpool, London & Globe Ins. Co. Ltd. ........ | 35,000 |
| 41 | Queen Ins. Co. of America ................... | 21,000 |
| 41 | The Newark Fire Ins. Co. .................... | 10,000 |
| 41 | Star Ins. Co. of America ..................... | 10,000 |
| 41 | Federal Union Ins. Co. ....................... | 10,000 |
| 42 | St. Paul Fire & Marine Ins. Co. ................ | 16,000 |
| 42 | Mercury Ins. Co. ............................ | 10,000 |
| 43 | Scottish Union & National Ins. Co............... | 18,000 |
| 43 | American Union Ins. Co. ...................... | 10,000 |
| 44 | Security Ins. Co. of New Haven ................ | 12,000 |
| 44 | East & West Ins. Co. ......................... | 10,000 |
| 45 | Springfield Fire & Marine Ins. Co. ............. | 53,000 |
| 45 | New England Fire Ins. Co. ................... | 10,000 |
| 45 | Michigan Fire & Marine Ins. Co. .............. | 10,000 |
| 45 | Sentinel Fire Ins. Co. ....................... | 10,000 |
| 46 | Standard Fire Ins. Co. of New Jersey ......... | 12,000 |
| 47 | Sun Ins. Office Ltd. ......................... | 14,000 |
| 47 | Patriotic Ins. Co. of America ................. | 10,000 |
| 48 | The Travelers Fire Ins. Co. .................. | 35,000 |
| 49 | The Yorkshire Ins. Co. Ltd. .................. | 10,000 |
| 49 | London & Provincial Marine & General Ins. Co. Ltd. ........................................ | 10,000 |
| 50 | British American Assur. Co. .................. | 10,000 |
| 50 | North River Ins. Co. ......................... | 13,000 |

| Group | Name of Company | Amount of Fine |
|-------|-----------------|----------------|
| 50 | United States Fire Ins. Co. .................... | $30,000 |
| 50 | Westchester Fire Ins. Co. .................... | 14,000 |
| 50 | Western Assur. Co. ......................... | 10,000 |

Certain fines in Group 50 are based upon percentage of impoundings although, due to an error, the full 5% was not paid to the Street fund.

The foregoing opinion of *Westhues* and *Dalton, Commissioners,* is adopted as the opinion of the court en banc. All the judges concur, except *Gantt, J.,* not sitting.